# BE&K CONSTRUCTION CO. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 01–518.   Argued April 16, 2002—Decided June 24, 2002

518

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post,* p. 537. BREYER, J., filed an opinion concurring in part and concurring in the judgment, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post,* p. 538.

*Maurice Baskin* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Wallace* argued the cause for respondents. With him on the brief for the National Labor Relations Board were *Solicitor General Olson, Austin C. Schlick, Arthur F. Rosenfeld, John H. Ferguson, Norton J. Come,* and *John Emad Arbab. Sandra Rae Benson, Theodore Franklin, Jonathan P. Hiatt, James B. Coppess, Peter D. Nussbaum, Meera Trehan,* and *Laurence Gold* filed a brief for respondent Unions.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioner sued respondent unions, claiming that their lobbying, litigation, and other concerted activities violated federal labor law and antitrust law. After petitioner lost on or withdrew each of its claims, the National Labor Relations Board decided petitioner had violated federal labor law by prosecuting an unsuccessful suit with a retaliatory motive. The Court of Appeals affirmed. Because we find the Board

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States et al. by *Stanley R. Strauss, Stephen A. Bokat, Robin S. Conrad,* and *Joshua A. Ulman;* and for the Society for Human Resource Management et al. by *Mark A. Carter* and *Daniel V. Yager.*

lacked authority to assess liability using this standard, we reverse and remand.

I

Petitioner, an industrial general contractor, received a contract to modernize a California steel mill near the beginning of 1987. 246 F. 3d 619, 621 (CA6 2001). According to petitioner, various unions attempted to delay the project because petitioner's employees were nonunion. *Ibid.* That September, petitioner and the mill operator filed suit against those unions in the District Court for the Northern District of California. App. to Pet. for Cert. 33a. The suit was based on the following basic allegations: First, the unions had lobbied for adoption and enforcement of an emissions standard, despite having no real concern the project would harm the environment. 246 F. 3d, at 621. Second, the unions had handbilled and picketed at petitioner's site—and also encouraged strikes among the employees of petitioner's subcontractors—without revealing reasons for their disagreement. *Ibid.* Third, to delay the construction project and raise costs, the unions had filed an action in state court alleging violations of California's Health and Safety Code. *Id.,* at 621–622. Finally, the unions had launched grievance proceedings against petitioner's joint venture partner based on inapplicable collective bargaining agreements. *Id.,* at 622.

Initially, petitioner and the mill operator sought damages under § 303 of the Labor-Management Relations Act, 1947 (LMRA), 61 Stat. 158, as amended, 29 U. S. C. § 187, which provides a cause of action against labor organizations for injuries caused by secondary boycotts prohibited under § 158(b)(4). 246 F. 3d, at 622. But after the District Court granted the unions' motion for summary judgment on the plaintiffs' lobbying- and grievance-related claims, the plaintiffs amended their complaint to allege that the unions' activities violated §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1–2, which prohibit certain agree-

ments in restraint of trade, monopolization, and attempts to monopolize. 246 F. 3d, at 622. The District Court dismissed the amended complaint, however, because it realleged claims that had already been decided. *Id.,* at 622–623. The District Court also dismissed the plaintiffs' claim regarding the unions' state court lawsuit since the plaintiffs had no evidence that the suit was not reasonably based and because two unions that the plaintiffs sued were never parties to that state court action. *Id.,* at 623.

The plaintiffs filed a second amended complaint. It included their remaining claims but again realleged claims that had already been decided. *Ibid.;* App. 32–33. The District Court dismissed the decided claims and imposed sanctions on the plaintiffs under Federal Rule of Civil Procedure 11. 246 F. 3d, at 623. At that point, the mill operator dismissed its remaining claims with prejudice. *Ibid.* The District Court then granted summary judgment to the unions on petitioner's antitrust claim once petitioner was unable to show the unions had formed a combination with nonlabor entities for an illegitimate purpose. *Ibid.* Petitioner dismissed its remaining claims and appealed. *Id.,* at 623–624.

The United States Court of Appeals for the Ninth Circuit affirmed the dismissal of petitioner's antitrust claim. It held that the District Court erred in requiring petitioner to prove that the unions combined with nonlabor entities for an illegitimate purpose, but found the error harmless since the unions had antitrust immunity when lobbying officials or petitioning courts and agencies, unless the activity was a sham. *USS–POSCO Industries* v. *Contra Costa County Bldg. & Const. Trades Council, AFL–CIO,* 31 F. 3d 800, 810 (CA9 1994). Petitioner did not argue that the unions' litigation activity had been objectively baseless, but maintained that "the unions [had] engaged in a pattern of *automatic* petitioning of governmental bodies . . . *without regard* to . . . the merits of said petitions." *Ibid.* (internal quotation marks omitted; emphasis added). The Ninth Circuit allowed that

petitioner's claim, if proved, could overcome the unions' antitrust immunity, but rejected it nonetheless because "fifteen of the twenty-nine [actions filed by the unions] . . . have proven successful. The fact that more than half of all the actions . . . turn out to have merit cannot be reconciled with the charge that the unions were filing [them] willy-nilly without regard to success." *Id.*, at 811 (footnote omitted).

The Ninth Circuit reversed the District Court's award of Rule 11 sanctions, however, after petitioner explained that it had realleged decided claims based on Circuit precedent suggesting that doing so was necessary to preserve them on appeal. *Ibid.* Although the Ninth Circuit decided that rule did not apply to amended complaints following summary judgment, it held that petitioner's view was not frivolous and that its counsel could not be blamed for "err[ing] on the side of caution." *Id.*, at 812.

In the meantime, two unions had lodged complaints against petitioner with the National Labor Relations Board (Board), 246 F. 3d, at 624, and after the federal proceedings ended, the Board's general counsel issued an administrative complaint against petitioner, alleging that it had violated § 8(a)(1) of the National Labor Relations Act (NLRA), 49 Stat. 452, as amended, 29 U. S. C. § 158(a)(1), by filing and maintaining the federal lawsuit. App. to Pet. for Cert. 29a. Section 8(a)(1) prohibits employers from restraining, coercing, or interfering with employees' exercise of rights related to self-organization, collective bargaining, and other concerted activities. 29 U. S. C. §§ 157, 158(a)(1).

A three-member panel of the Board addressed cross-motions for summary judgment and ruled in favor of the general counsel. The panel determined that petitioner's federal lawsuit had been unmeritorious because all of petitioner's claims were dismissed or voluntarily withdrawn with prejudice. App. to Pet. for Cert. 30a, 47a, 49a. The panel then examined whether petitioner's suit had been filed to retaliate against the unions for engaging in activities protected under

the NLRA. The panel first concluded that the unions' conduct was protected activity, id., at 50a–59a, and then decided that petitioner's lawsuit had been unlawfully motivated because it was "directed at protected conduct" and "necessarily tended to discourage similar protected activity," and because petitioner admitted it had filed suit "'to stop certain [u]nion conduct which it believed to be unprotected,'" id., at 59a–60a. The panel found additional evidence of retaliatory motive because petitioner had sued some unions that were not parties to the state court lawsuit. Id., at 60a. The panel also found evidence of retaliatory motive because petitioner's LMRA claims had an "utter absence of merit" and had been dismissed on summary judgment. Id., at 61a. After determining that petitioner's suit had violated the NLRA because it was unsuccessful and retaliatory, the panel ordered petitioner to cease and desist from prosecuting such suits and to post notice to its employees admitting it had been found to have violated the NLRA and promising not to pursue such litigation in the future. Id., at 65a–67a. The panel also ordered petitioner to pay the unions' legal fees and expenses incurred in defense of the federal suit. Id., at 65a.

Petitioner sought review of the Board's decision in the United States Court of Appeals for the Sixth Circuit, and the Board cross-petitioned for enforcement of its order. The Sixth Circuit granted the Board's petition. Relying on Bill Johnson's Restaurants, Inc. v. NLRB, 461 U. S. 731, 747 (1983), the Sixth Circuit held that "because the judicial branch of government had already determined that [petitioner's] claims against the unions were unmeritorious or dismissed, evidence of a simple retaliatory motive . . . suffice[d] to adjudge [petitioner] of committing an unfair labor practice." 246 F. 3d, at 628. The court rejected petitioner's argument that under Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U. S. 49 (1993), "only baseless or 'sham' suits serve to restrict the otherwise unfettered right to seek court resolution of differences."

246 F. 3d, at 629. Instead, the court decided *Professional Real Estate Investors* was inapplicable because its immunity standard had been established in the antitrust context without reference to any standard for determining if completed litigation violates the NLRA. 246 F. 3d, at 629. The Sixth Circuit found that substantial evidence supported the Board's inference of retaliatory motive because petitioner had filed an unmeritorious suit, realleged previously decided claims, sought treble damages on its antitrust claim, and sought damages from unions not parties to the state court suit. *Id.*, at 629–631. The court also upheld the Board's award of attorney's fees. *Id.*, at 632.

Petitioner sought review of the Sixth Circuit's judgment by a petition for certiorari that raised four separate questions. We granted certiorari on the following rephrased question:

> "Did the Court of Appeals err in holding that under *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731 (1983), the NLRB may impose liability on an employer for filing a losing retaliatory lawsuit, even if the employer could show the suit was not objectively baseless under *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U. S. 49 (1993)?" 534 U. S. 1074 (2002).

We now reverse the judgment of the Sixth Circuit and remand.

## II

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." We have recognized this right to petition as one of "the most precious of the liberties safeguarded by the Bill of Rights," *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217, 222 (1967), and have explained that the right is implied

by "[t]he very idea of a government, republican in form," *United States* v. *Cruikshank*, 92 U. S. 542, 552 (1876).

We have also considered the right to petition when interpreting federal law. In the antitrust context, for example, we held that "the Sherman Act does not prohibit . . . persons from associating . . . in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, 136 (1961). We based our interpretation in part on the principle that we would not "lightly impute to Congress an intent to invade . . . freedoms" protected by the Bill of Rights, such as the right to petition. *Id.*, at 138. We later made clear that this antitrust immunity "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Mine Workers* v. *Pennington*, 381 U. S. 657, 670 (1965).

These antitrust immunity principles were then extended to situations where groups "use . . . *courts* to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors." *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 511 (1972) (emphasis added). We thus made explicit that "the right to petition extends to all departments of the Government," and that "[t]he right of access to the courts is . . . but one aspect of the right of petition." *Id.*, at 510.

Even then, however, we emphasized that such immunity did not extend to "illegal and reprehensible practice[s] which may corrupt the . . . judicial proces[s]," *id.*, at 513, hearkening back to an earlier statement that antitrust immunity would not extend to lobbying "ostensibly directed toward influencing governmental action [that] is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr, supra*, at 144. This line of cases thus establishes that while

genuine petitioning is immune from antitrust liability, sham petitioning is not.

In *Professional Real Estate Investors*, we adopted a two-part definition of sham antitrust litigation: first, it "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; second, the litigant's subjective motivation must "concea[l] an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." 508 U. S., at 60–61 (internal quotation marks omitted; emphasis in original). For a suit to violate the antitrust laws, then, it must be a sham *both* objectively and subjectively.

This case raises the same underlying issue of when litigation may be found to violate federal law, but this time with respect to the NLRA rather than the Sherman Act. Recognizing this underlying connection, we previously decided whether the Board could enjoin state court lawsuits by analogizing to the antitrust context. In *Bill Johnson's*, a restaurant owner had filed a state court lawsuit against individuals who picketed its restaurant after a waitress was fired. 461 U. S., at 733–734. The owner alleged that the picketing was harassing and dangerous and that a leaflet distributed by the picketers was libelous. *Id.*, at 734. The waitress filed a charge with the Board claiming the suit had been filed in retaliation for participation in protected activities. *Id.*, at 735. The Administrative Law Judge (ALJ) decided that the owner's suit lacked a reasonable basis and was intended to penalize protected activity based on his assessment of the evidence and its credibility. *Id.*, at 736, 744. The Board upheld this determination and ordered the owner to withdraw its suit and pay the defendants' legal expenses. *Id.*, at 737. The Court of Appeals enforced the order. *Ibid.*

We vacated the judgment, however, holding that First Amendment and federalism concerns prevented "[t]he filing

and prosecution of a well-founded lawsuit" from being "enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [NLRA]." *Id.*, at 737, 743. We also held that the Board may not decide that a suit is baseless by making credibility determinations, as the ALJ had done, when genuine issues of material fact or state law exist. *Id.*, at 745, 746–747. In recognition of our sham exception to antitrust immunity, however, we reasoned that "[w]e should follow a similar course under the NLRA" and held that the Board could enjoin baseless suits brought with a retaliatory motive, *id.*, at 744 (citing *California Motor Transport, supra*), and then remanded for further proceedings, 461 U. S., at 749.

At issue today is not the standard for enjoining ongoing suits but the standard for declaring completed suits unlawful. In *Bill Johnson's*, we remarked in dicta about that situation:

> "If judgment goes against the employer in the state court, . . . or if his suit is withdrawn or is otherwise shown to be without merit, the employer has had its day in court, the interest of the State in providing a forum for its citizens has been vindicated, and the Board may then proceed to adjudicate the . . . unfair labor practice case. The employer's suit having proved unmeritorious, the Board would be warranted in taking that fact into account in determining whether the suit had been filed in retaliation for the exercise of the employees' [NLRA] § 7 rights. If a violation is found, the Board may order the employer to reimburse the employees whom he had wrongfully sued for their attorney's fees and other expenses. It may also order any other proper relief that would effectuate the policies of the [NLRA]." *Id.*, at 747.

Under this standard, the Board could declare that a lost or withdrawn suit violated the NLRA if it was retaliatory. In

*Bill Johnson's,* however, the issue before the Court was whether the Board could enjoin an ongoing state lawsuit without finding that the suit lacked a reasonable basis in law or fact. *Id.,* at 733. To resolve that issue, we had no actual need to decide whether the Board could declare unlawful reasonably based suits that were ultimately unsuccessful. Indeed, the Board had yet to declare such a suit unlawful: It had attempted to enjoin an *un*completed suit that it had declared *baseless. Id.,* at 736–737. Nor did we have occasion to consider the precise scope of the term "retaliation." See *infra,* at 533, 537.

Moreover, although our statements regarding completed litigation were intended to guide further proceedings, we did not expressly order the Board to adhere to its prior finding of unlawfulness under the standard we stated. See 461 U. S., at 749–750, n. 15 ("[O]n remand the Board *may* reinstate its finding that petitioner acted unlawfully . . . *if* the Board adheres to its previous finding that the suit was filed for a retaliatory purpose" (emphasis added)). Thus, exercising our "customary refusal to be bound by dicta," *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership,* 513 U. S. 18, 24 (1994), we turn to the question presented.

## III

Because of its objective component, the sham litigation standard in *Professional Real Estate Investors* protects reasonably based petitioning from antitrust liability. Because of its subjective component, it also protects petitioning that is unmotivated by anticompetitive intent, whether it is reasonably based or not. The Board admits such broad immunity is justified in the antitrust context because it properly "balances the risk of anticompetitive lawsuits against the chilling effect" on First Amendment petitioning that might be caused by "the treble-damages remedy and other distinct features of antitrust litigation," such as the fact that antitrust claims may be privately initiated and may impose high

discovery costs. Brief for Respondent NLRB 40–41. According to the Board, however, such broad protection is unnecessary in the labor law context because, outside of the LMRA, enforcement of the NLRA requires the Board's general counsel to first authorize the issuance of an administrative complaint; thus, an adjudication cannot be launched solely by private action. See 29 U. S. C. § 153(d); *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112, 118–119 (1987). Nor can the Board issue punitive remedies, see *Republic Steel Corp.* v. *NLRB*, 311 U. S. 7, 10–12 (1940), and instead is limited to restoring the previolation status quo, see *id.*, at 12–13; *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U. S. 258, 265 (1969). The Board also allows "little prehearing discovery." *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 236 (1978).

At most, however, these arguments demonstrate that the threat of an antitrust suit may pose a *greater* burden on petitioning than the threat of an NLRA adjudication. This does not mean the burdens posed by the NLRA raise no First Amendment concerns. To determine if they do, we must first isolate those burdens.

Here, the Board's determination that petitioner's lawsuit violated the NLRA resulted in an order requiring petitioner to post certain notices, refrain from filing similar suits, and pay the unions' attorney's fees. Petitioner did not challenge below the Board's authority to impose the notice and injunction penalties upon a finding of illegality, but did challenge the Board's authority to award attorney's fees, albeit unsuccessfully. 246 F. 3d, at 631–632. Although petitioner sought review of the fee issue, Pet. for Cert. i, we did not grant certiorari on that specific question, instead asking the parties to address whether the Board may impose liability for a retaliatory lawsuit that was unsuccessful even if it was not objectively baseless. 534 U. S. 1074 (2002).

As we see it, a threshold question here is whether the Board may declare that an unsuccessful retaliatory lawsuit

violates the NLRA even if reasonably based. If it may, the resulting finding of illegality is a burden by itself. In addition to a declaration of illegality and whatever legal consequences flow from that, the finding also poses the threat of reputational harm that is different and additional to any burden posed by other penalties, such as a fee award. Because we can resolve this case by looking only at the finding of illegality, we need not decide whether the Board otherwise has authority to award attorney's fees when a suit is found to violate the NLRA.

Having identified this burden, we must examine the petitioning activity it affects. In *Bill Johnson's*, we held that the Board may not enjoin reasonably based state court lawsuits in part because of First Amendment concerns. 461 U. S., at 742–743. We implied those concerns are no longer present when a suit ends because "the employer has had its day in court." *Id.*, at 747. By analogy to other areas of First Amendment law, one might assume that any concerns related to the right to petition must be greater when enjoining ongoing litigation than when penalizing completed litigation. After all, the First Amendment historically provides greater protection from prior restraints than after-the-fact penalties, see *Alexander* v. *United States*, 509 U. S. 544, 553–554 (1993), and enjoining a lawsuit could be characterized as a prior restraint, whereas declaring a completed lawsuit unlawful could be characterized as an after-the-fact penalty on petitioning. But this analogy at most suggests that injunctions may raise greater First Amendment concerns, not that after-the-fact penalties raise no concerns. Likewise, the fact that *Bill Johnson's* allowed certain *baseless* suits to be enjoined tells little about the propriety of imposing penalties on various classes of *nonbaseless* suits.

We said in *Bill Johnson's* that the Board could enjoin baseless retaliatory suits because they fell outside of the First Amendment and thus were analogous to "false statements." 461 U. S., at 743. We concluded that "[j]ust as false state-

ments are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." *Ibid.* (citations omitted). While this analogy is helpful, it does not suggest that the class of baseless litigation is *completely* unprotected: At most, it indicates such litigation should be unprotected "just as" false statements are. And while false statements may be unprotected for their own sake, "[t]he First Amendment requires that we protect some falsehood in order to protect *speech that matters.*" *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 341 (1974) (emphasis added); *id.,* at 342 (noting the need to protect some falsehoods to ensure that "the freedoms of speech and press [receive] that 'breathing space' essential to their fruitful exercise" (quoting *NAACP* v. *Button,* 371 U. S. 415, 433 (1963))). An example of such "breathing space" protection is the requirement that a public official seeking compensatory damages for defamation prove by clear and convincing evidence that false statements were made with knowledge or reckless disregard of their falsity. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280, 285 (1964).

It is at least consistent with these "breathing space" principles that we have never held that the entire class of objectively baseless litigation may be enjoined or declared unlawful even though such suits may advance no First Amendment interests of their own. Instead, in cases like *Bill Johnson's* and *Professional Real Estate Investors,* our holdings limited regulation to suits that were both objectively baseless *and* subjectively motivated by an unlawful purpose. But we need not resolve whether objectively baseless litigation requires any "breathing room" protection, for what is at issue here are suits that are not baseless in the first place. Instead, as an initial matter, we are dealing with the class of reasonably based but unsuccessful lawsuits. But whether this class of suits falls outside the scope of the First Amend-

ment's Petition Clause at the least presents a difficult constitutional question, given the following considerations.

First, even though all the lawsuits in this class are unsuccessful, the class nevertheless includes a substantial proportion of all suits involving genuine grievances because the genuineness of a grievance does not turn on whether it succeeds. Indeed, this is reflected by our prior cases which have protected petitioning whenever it is genuine, not simply when it triumphs. See, *e. g., Professional Real Estate Investors*, 508 U. S., at 58–61 (protecting suits from antitrust liability whenever they are objectively or subjectively genuine); *Pennington*, 381 U. S., at 670 (shielding from antitrust immunity any "concerted effort to influence public officials"). Nor does the text of the First Amendment speak in terms of successful petitioning—it speaks simply of "the right of the people . . . to petition the Government for a redress of grievances."

Second, even unsuccessful but reasonably based suits advance some First Amendment interests. Like successful suits, unsuccessful suits allow the "'public airing of disputed facts,'" *Bill Johnson's, supra*, at 743 (quoting Balmer, Sham Litigation and the Antitrust Law, 29 Buffalo L. Rev. 39, 60 (1980)), and raise matters of public concern. They also promote the evolution of the law by supporting the development of legal theories that may not gain acceptance the first time around. Moreover, the ability to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force. See Andrews, A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right, 60 Ohio St. L. J. 557, 656 (1999) (noting the potential for avoiding violence by the filing of unsuccessful claims).

Finally, while baseless suits can be seen as analogous to false statements, that analogy does not directly extend to suits that are unsuccessful but reasonably based. For even if a suit could be seen as a kind of provable statement, the

fact that it loses does not mean it is false. At most it means the plaintiff did not meet its burden of proving its truth. That does not mean the defendant has proved—or could prove—the contrary.

Because the Board confines its penalties to unsuccessful suits brought with a retaliatory motive, however, we must also consider the significance of that particular limitation, which is fairly included within the question presented. See 534 U. S. 1074 (2002) (granting certiorari on whether the Board "may impose liability on an employer for filing a losing *retaliatory* lawsuit, even if the employer could show the suit was not objectively baseless" (emphasis added)).

## IV

In the context of employer-filed lawsuits, we previously indicated that retaliatory suits are those "filed in retaliation for the exercise of the employees' [NLRA] § 7 rights." *Bill Johnson's*, 461 U. S., at 747. Because we did not specifically address what constitutes "retaliation," however, the precise scope of that term was not defined. The Board's view is that a retaliatory suit is one "brought with a motive to *interfere* with the exercise of protected [NLRA § ]7 rights." Brief for Respondent NLRB 46 (emphasis added). As we read it, however, the Board's definition broadly covers a substantial amount of genuine petitioning.

For example, an employer may file suit to stop conduct by a union that he reasonably believes is illegal under federal law, even though the conduct would otherwise be protected under the NLRA. As a practical matter, the filing of the suit may interfere with or deter some employees' exercise of NLRA rights. Yet the employer's motive may still reflect only a subjectively genuine desire to test the legality of the conduct. Indeed, in this very case, the Board's first basis for finding retaliatory motive was the fact that petitioner's suit related to protected conduct that petitioner believed was unprotected. App. to Pet. for Cert. 59a–60a. If such

a belief is both subjectively genuine and objectively reasonable, then declaring the resulting suit illegal affects genuine petitioning.

The Board also claims to rely on evidence of antiunion animus to infer retaliatory motive. Brief for Respondent NLRB 47. Yet ill will is not uncommon in litigation. Cf. *Professional Real Estate Investors*, 508 U. S., at 69 (STEVENS, J., concurring in judgment) ("We may presume that every litigant intends harm to his adversary"). Disputes between adverse parties may generate such ill will that recourse to the courts becomes the only legal and practical means to resolve the situation. But that does not mean such disputes are not genuine. As long as a plaintiff's *purpose* is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively. See *id.*, at 60–61.

Even in other First Amendment contexts, we have found it problematic to regulate some *demonstrably false* expression based on the presence of ill will. For example, we invalidated a criminal statute prohibiting false statements about public officials made with ill will. See *Garrison* v. *Louisiana*, 379 U. S. 64, 73–74 (1964) ("Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred"). Indeed, the requirement that private defamation plaintiffs prove the falsity of speech on matters of public concern may indirectly shield much speech concealing ill motives. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 776–777 (1986); see also *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 53 (1988) (prohibiting use of ill motive to create liability for speech in the realm of public debate about public figures).

For these reasons, the difficult constitutional question we noted earlier, *supra*, at 531–533, is not made significantly easier by the Board's retaliatory motive limitation since that

limitation fails to exclude a substantial amount of petitioning that is objectively and subjectively genuine.

The final question is whether, in light of the important goals of the NLRA, the Board may nevertheless burden an unsuccessful but reasonably based suit when it concludes the suit was brought with a retaliatory purpose. As explained above, *supra*, at 525–526, we answered a similar question in the negative in the antitrust context. And while the burdens on speech at issue in this case are different from those at issue in *Professional Real Estate Investors*, we are still faced with a difficult constitutional question: namely, whether a class of petitioning may be declared *unlawful* when a substantial portion of it is subjectively *and* objectively genuine.

In a prior labor law case, we avoided a similarly difficult First Amendment issue by adopting a limiting construction of the relevant NLRA provision. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). At issue there was the scope of § 8(b)(4) of the NLRA, 29 U. S. C. § 158(b)(4), which limits unions from "threaten[ing], coerc[ing], or restrain[ing] any person engaged in commerce or in an industry affecting commerce" with respect to certain prohibited purposes. § 158(b)(4)(ii). The Board read this provision to cover handbilling that urged customers not to shop at a mall where the purpose of the handbilling was to convince the mall's proprietor to influence a tenant to quit dealing with a nonunion contractor. 485 U. S., at 574. A prior case had held that the same statutory prohibition on threats, coercion, and restraints was " 'nonspecific, indeed vague,' and [thus] should be interpreted with 'caution' and not given a 'broad sweep.' " *Id.*, at 578 (quoting *NLRB* v. *Drivers*, 362 U. S. 274, 290 (1960)). Likewise, in *DeBartolo*, we found that the statutory provisions and their legislative history indicated no clear intent to reach the handbilling in question, 485 U. S., at 578–588, and so we simply read the statute not to cover it,

thereby avoiding the First Amendment question altogether, *id.*, at 588.

Here, the relevant NLRA provision is § 8(a)(1), 29 U. S. C. § 158(a)(1), which prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in [29 U. S. C. § ]157." Section 157 provides, in relevant part:

> "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

Section 158(a)(1)'s prohibition on interfering, restraining, or coercing in connection with the above rights is facially as broad as the prohibition at issue in *DeBartolo.* And while it might be read to reach the entire class of suits the Board has deemed retaliatory, it need not be read so broadly. Indeed, even considered in context, there is no suggestion that these provisions were part of any effort to cover that class of suits. See §§ 158(a)(2)–(5) (generally prohibiting employers from interfering with the formation and administration of a union, from discriminating in employment practices based on union membership, from discharging employees who provide testimony or file charges under the NLRA, and from refusing to bargain collectively with employee representatives).

Because there is nothing in the statutory text indicating that § 158(a)(1) must be read to reach all reasonably based but unsuccessful suits filed with a retaliatory purpose, we decline to do so. Because the Board's standard for imposing liability under the NLRA allows it to penalize such suits, its standard is thus invalid. We do not decide whether the Board may declare unlawful any unsuccessful but reasonably based suits that would not have been filed but for a motive to impose the costs of the litigation process, regardless of the

outcome, in retaliation for NLRA protected activity, since the Board's standard does not confine itself to such suits. Likewise, we need not decide what our dicta in *Bill Johnson's* may have meant by "retaliation." 461 U. S., at 747; see *supra*, at 527–528. Finally, nothing in our holding today should be read to question the validity of common litigation sanctions imposed by courts themselves—such as those authorized under Rule 11 of the Federal Rules of Civil Procedure—or the validity of statutory provisions that merely authorize the imposition of attorney's fees on a losing plaintiff.

The judgment of the Court of Appeals for the Sixth Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

Although the Court scrupulously avoids deciding the question (which is not presented in this case), I agree with JUSTICE BREYER that the implication of our decision today is that, in a future appropriate case, we will construe the National Labor Relations Act (NLRA) in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process. See *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U. S. 49, 60–61 (1993).

Choosing to make explicit what is implied, and then disagreeing with that result, JUSTICE BREYER describes a number of differences between the NLRA and the Sherman Act, all of which suggest to him that a complainant enjoys greater First Amendment rights to file a lawsuit in the face of the latter than the former. *Post*, at 541–544 (opinion concurring in part and concurring in judgment). Missing from his list, however, is the most important difference of all, which suggests—indeed, demands—precisely the oppo-

site conclusion. Under the Sherman Act, the entity making the factual determination whether the objectively reasonable suit was brought with an unlawful motive would have been an Article III court; even with that protection, we thought the right of access to Article III courts too much imperiled. Under the NLRA, however, the entity making the factual finding that determines whether a litigant will be punished for filing an objectively reasonable lawsuit will be an executive agency, the National Labor Relations Board. That this difference undermines JUSTICE BREYER's analysis, there can be no doubt. At the very least, it poses a difficult question under the First Amendment: whether an *executive agency* can be given the power to punish a reasonably based suit filed in an Article III court whenever *it* concludes—insulated from *de novo* judicial review by the substantial-evidence standard of 29 U. S. C. §§ 160(e), (f)—that the complainant had one motive rather than another. This makes resort to the courts a risky venture, dependent upon the findings of a body that does not have the independence prescribed for Article III courts. It would be extraordinary to interpret a statute which is silent on this subject to intrude upon the courts' ability to decide *for themselves* which postulants for their assistance should be punished.

For this reason, I am able, unlike JUSTICE BREYER, to join the Court's opinion in full—including its carefully circumscribed statement that "nothing in our holding today should be read to question the validity of common litigation sanctions *imposed by courts themselves*," *ante*, at 537 (emphasis added).

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, concurring in part and concurring in the judgment.

As I understand the Court's opinion, it focuses on employer lawsuits that are (1) reasonably based, (2) unsuccessful, and (3) filed with a "retaliatory motive," *i. e.*, a motive to

interfere with protected union conduct. See *ante*, at 532–533. The Court holds that the National Labor Relations Act (NLRA or Act) does not permit the National Labor Relations Board to declare unlawful under § 8(a) of the Act, 29 U. S. C. § 158(a), an employer's filing suit *in the circumstances present here,* which is to say, in the kind of case in which the Board rests its finding of "retaliatory motive" almost exclusively upon the simple fact that the employer filed a reasonably based but unsuccessful lawsuit and the employer did not like the union. *Ante,* at 522–524. The Court expressly leaves open *other circumstances* in which the evidence of "retaliation" or antiunion motive might be stronger or different, showing, for example, an employer, indifferent to outcome, who intends the reasonably based but unsuccessful lawsuit simply to impose litigation costs on the union. *Ante,* at 536–537; see also *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.,* 508 U. S. 49, 73–76 (1993) (STEVENS, J., joined by O'CONNOR, J., concurring in judgment) (discussing colorable suits that would not be filed but for an illegal purpose). And it does not address at all lawsuits the employer brings as part of a broader course of conduct aimed at harming the unions and interfering with employees' exercise of their rights under § 7(a) of the NLRA, 29 U. S. C. § 157.

I concur in the Court's opinion insofar as it holds no more than I have just set forth. While I recognize the broad leeway the Act gives the Board to make findings and to determine appropriate relief, § 10(c), 29 U. S. C. § 160; see *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 612, n. 32 (1969); *Shepard* v. *NLRB,* 459 U. S. 344, 349 (1983), I concur because the descriptions given by the Board and the Court of Appeals of the Board's reasons for finding unlawful employer activity here, insofar as they are probative, seem to me to rest on little more than the fact that the employer filed a reasonably based but ultimately unsuccessful lawsuit. See 329 N. L. R. B. No. 68 (1999), App. to Pet. for Cert. 59a–61a

(finding retaliatory motive because the suit was "directed at protected conduct," "necessarily tended to discourage similar protected activity," was admittedly brought to stop conduct BE&K Construction Company thought was unprotected, involved unions other than those parties to certain suits against the company, and was unmeritorious); 246 F. 3d 619, 629–630 (CA6 2001). *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731, 747 (1983), suggested that "the Board would be warranted in taking . . . into account" for unfair labor practice purposes the fact that an employer had lost its suit, but it did not suggest, as it seems the Board thought here, that losing a lawsuit against a union, in and of itself, virtually alone, shows retaliation. See *id.*, at 743 (suggesting that retaliatory suits might be those that "would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act").

Insofar as language in the Court's opinion might suggest a more far-reaching rule, see *ante*, at 524–533, I do not agree. For one thing, I believe that *Bill Johnson's* decided many of the questions the Court declares unanswered. See *ante*, at 527–528, 537. It held that while the Board may not *halt* the prosecution of a lawsuit unless the suit lacks an objectively reasonable basis, it nonetheless "may . . . proceed to adjudicate the §8(a)(1) and §8(a)(4) unfair labor practice case" when an employer brings a merely "unmeritorious" retaliatory suit and loses. 461 U. S., at 747. It added that the "employer's suit having proved unmeritorious, the Board *would be warranted in taking that fact into account* in determining whether the suit had been filed in retaliation for the exercise of the employees' §7 rights." *Ibid.* (emphasis added). The courts, the Board, the bar, employers, and unions alike have treated the Court's discussion of completed lawsuits in *Bill Johnson's* as a holding and have followed it for 20 years. See, *e. g., Petrochem Insulation, Inc.* v. *NLRB*, 240 F. 3d 26, 32 (CADC), cert. denied, 534 U. S. 992

(2001); *Diamond Walnut Growers, Inc.* v. *NLRB*, 53 F. 3d 1085, 1088 (CA9 1995); *NLRB* v. *International Union of Operating Engineers, Local 520, AFL–CIO*, 15 F. 3d 677, 679 (CA7 1994); *Braun Elec. Co.*, 324 N. L. R. B. 1, 2 (1997); *Summitville Tiles*, 300 N. L. R. B. 64, 65, and n. 6 (1990); *Machinists Lodge 91 (United Technologies)*, 298 N. L. R. B. 325, 326 (1990), enf'd, 934 F. 2d 1288 (CA2 1991). I can find no good reason to characterize the statements in *Bill Johnson's* as dicta—though I recognize that the Court's language so characterizing *Bill Johnson's* is itself dicta.

For another thing, I do not believe that this Court's antitrust precedent determines the outcome here. See *Professional Real Estate, supra; Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961). That precedent finds all but sham lawsuits exempt from the reach of the *antitrust laws. Professional Real Estate, supra*, at 60–61; *Noerr, supra*, at 144. It does not hold employers enjoy a similar exemption from the reach of the *labor laws.* And it should not do so, for antitrust law and labor law differ significantly in respect to their consequences, administration, scope, history, and purposes.

Certain differences, while minor, are worth noting given the Court's concern to avoid discouraging legitimate lawsuits. To apply antitrust law to a defendant's reasonably based but unsuccessful anticompetitive lawsuit, for example, threatens the defendant with treble damages—a considerable deterrent. See *ante*, at 528. To apply labor law to an employer's reasonably based but unsuccessful retaliatory lawsuit threatens the employer only with a shift in liability for attorney's fees. See *ante*, at 529. Similarly, to apply antitrust law to a defendant's reasonably based but unsuccessful anticompetitive lawsuit threatens the defendant with high court-defense costs against any and all who initiate suit. To apply labor law to an employer's reasonably based but unsuccessful retaliatory lawsuit threatens the employer only with the typically far lower costs of defending the charge

before a congressionally authorized and politically account-
able administrative agency that acts as a screen for meritless
complaints. See *ibid.;* see also 64 NLRB Ann. Rep. 5 (1999)
(showing that of 27,450 unfair labor practice cases closed in
1999, only 1.4% were resolved by an order of the Board in a
contested case).

Other differences, those related to scope, purpose, and his-
tory, are major and determinative. Antitrust law focuses
generally upon anticompetitive conduct that can arise in
myriad circumstances. Anticompetitively motivated law-
suits occupy but one tiny corner of the anticompetitive-
activity universe. To circumscribe the boundaries of that
corner does not significantly limit the scope of antitrust law
or undermine any basic related purpose.

By way of contrast, the NLRA finds in the need to regu-
late an employer's antiunion lawsuits much of its histori-
cal reason for being. Throughout the 19th century, courts
had upheld prosecutions of unions as criminal conspiracies.
C. Tomlins, The State and the Unions 36–45 (1985). They
had struck down protective labor legislation—for, say,
shorter working hours or better working conditions. W.
Forbath, Law and the Shaping of the American Labor Move-
ment 38, and n. 7 (1991) (by 1900, courts had struck down
roughly 60 labor laws, and by 1920, roughly 300). They had
granted injunctions against employees and labor unions that
weakened the unions' ability to organize. *Id.,* at 61–62 (con-
servatively estimating at least 4,300 injunctions issued in
labor conflicts between 1880 and 1930). And in the process
they had reinterpreted federal statutes that Congress had
not intended for use against the organizing activities of labor
unions. See, *e. g., In re Debs,* 158 U. S. 564 (1895) (applying
Interstate Commerce Act of 1887 to union activities); *Loewe*
v. *Lawlor,* 208 U. S. 274 (1908) (applying Sherman Act); see
generally F. Frankfurter & N. Greene, The Labor Injunc-
tion (1930).

Congress initially passed the Clayton Act, 15 U. S. C. §§ 12–27, 44, to prevent employers from using the law, particularly antitrust law, in this way. In doing so, Congress hoped to "substitut[e] the opinion of Congress as to the propriety of the purpose [of union activities] for that of differing judges" who were "prejudicial to a position of equality between workingman and employer." *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 485–486 (1921) (Brandeis, J., joined by Holmes and Clarke, JJ., dissenting). When the Clayton Act proved insufficient, Congress passed the Norris-LaGuardia Act, 29 U. S. C. § 101, which made the labor injunction unlawful. See *United States* v. *Hutcheson,* 312 U. S. 219, 235–236 (1941) ("The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction"); see also *Marine Cooks* v. *Panama S. S. Co.,* 362 U. S. 365, 369–370, n. 7 (1960) (enactment of Norris-LaGuardia "was prompted by a desire . . . to withdraw federal courts from a type of controversy for which many believed they were ill-suited"). Similar objectives informed Congress' later enactment of the NLRA, which took from the courts much of the power to regulate "the relations between employers of labor and workingmen" by granting authority to an administrative agency. *Duplex Printing, supra,* at 486 (Brandeis, J., dissenting); see *Mine Workers* v. *Pennington,* 381 U. S. 657, 703 (1965) (Goldberg, J., dissenting from opinion but concurring in reversal) (describing how Justice Brandeis' dissent in *Duplex Printing* "carried the day in the courts of history" when Congress passed Norris-LaGuardia and the NLRA).

The upshot is that an employer's antiunion lawsuit occupies a position far closer to the heart of the labor law than does a defendant's anticompetitive lawsuit in respect to antitrust law. And that fact makes all the difference. Indeed,

given these differences of history and purpose, I do not see how the Court could treat labor law, which sought to give the Board power to regulate an employer's antiunion conduct, including retaliatory lawsuits, as if it were antitrust law, where no comparable purpose is evident. Perhaps that is why this Court previously made clear that these two areas of law significantly differ. Compare *Professional Real Estate*, 508 U. S., at 55–60, with *Bill Johnson's*, 461 U. S., at 747.

I do not know why the Court reopens these matters in its opinion today. See *ante*, at 528, 536–537. But I note that it has done so only to leave them open. It does not, in the end, decide them. On that understanding, but only to the extent that I describe at the outset, see *supra*, at 538–540, I join the Court's opinion.