**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CSX HOTELS, INCORPORATED, a/k/a
The Greenbrier,
                              *Petitioner,*

                    v.

NATIONAL LABOR RELATIONS BOARD,
                              *Respondent,*

INTERNATIONAL UNION OF OPERATING
ENGINEERS, Local 132, AFL-CIO,
                              *Intervenor.*

No. 03-2274

NATIONAL LABOR RELATIONS BOARD,
                              *Petitioner,*

INTERNATIONAL UNION OF OPERATING
ENGINEERS, Local 132, AFL-CIO,
                              *Intervenor,*

                    v.

CSX HOTELS, INCORPORATED, a/k/a
The Greenbrier,
                              *Respondent.*

No. 03-2432

On Petition for Review and Cross-application
for Enforcement of an Order of the
National Labor Relations Board.
(11-CA-19537)

Argued: May 5, 2004

Decided: July 26, 2004

Before LUTTIG, MOTZ, and SHEDD, Circuit Judges.

Petition for Review granted, and Cross-application for Enforcement denied by published opinion. Judge Shedd wrote the opinion, in which Judge Luttig joined. Judge Motz wrote a concurring opinion.

---

**COUNSEL**

**ARGUED:** Karl Montague Terrell, STOKES & MURPHY, P.C., Atlanta, Georgia, for Petitioner/Cross-Respondent. Jeffrey Michael Hirsch, Office of the General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board. James Paul McHugh, BARRETT, CHAFIN, LOWRY, AMOS & MCHUGH, Charleston, West Virginia, for Intervenor. **ON BRIEF:** Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, David S. Habenstreit, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

---

**OPINION**

SHEDD, Circuit Judge:

The International Union of Operating Engineers, Local No. 132, AFL-CIO (the "Union") filed an unfair labor practice charge before the National Labor Relations Board, claiming that CSX Hotels, Inc. (doing business as the Greenbrier, a resort near White Sulphur Springs, West Virginia) violated the National Labor Relations Act (the "Act") by interfering with the Union's right to engage in lawful picketing. The Administrative Law Judge decided that the Greenbrier violated the Act on both June 20 and June 24, 2002. The Greenbrier filed exceptions to the ALJ's decision with the Board. A divided panel of the Board adopted the ALJ's decision, but only as to the June 24 violation. The Greenbrier now petitions for review of the Board's decision, and the Board cross-applies for enforcement of its order. The Union has intervened. We grant the Greenbrier's petition for review and deny the Board's cross-application for enforcement.

I.

In June 2002, Lynch Construction was building a maintenance facility on the Greenbrier's property. The Union determined that Lynch Construction violated its agreement with the Union by hiring employees represented by a different labor union to work on the Greenbrier project. To protest this alleged breach of agreement, the Union set up a picketing stand a few feet from the Greenbrier's property line near the Greenbrier's employee entrance on the public right-of-way along U.S. Highway 60.

Although Highway 60 has only two lanes, it is a major artery for traffic heading to and from the Greenbrier, the city of White Sulphur Springs, and several other destinations in Greenbrier County. Traffic along Highway 60 is especially heavy during the morning and after-noon commutes. Until 1995, when the White Sulphur Springs Police Department took jurisdiction over this particular stretch of road, Highway 60 averaged one death per year for more than a decade. The speed limit is 55 m.p.h. on the portion of Highway 60 where the Union chose to picket.

During the morning commute on the first day of picketing, Thursday, June 20, 2002, about twenty picketers from the Union congregated on the public right-of-way near the Greenbrier's employee entrance. The Greenbrier's security director flagged down a White Sulphur Springs police officer who was passing by on Highway 60 and informed him about the picketers.[1] That officer went to where the picketers were protesting and ordered them to move their vehicles, which were parked in an unauthorized zone along Highway 60. The officer also told the picketers that he would check at the police station to see if they needed an assembly permit to picket in that particular location. The picketers moved their vehicles away from Highway 60 and resumed picketing.

Soon thereafter, the general manager of the Greenbrier approached the picketers to ask what they were doing at the Greenbrier's employee entrance. The picketers informed him that they were picket-

---

[1]The officer testified that he already knew about the picketers before he spoke with the Greenbrier's security director.

ing Lynch Construction and that the Lynch Construction employees were using the Greenbrier's employee entrance. After the general manager assured the picketers that he would require Lynch Construction to use its own designated entrance to the property (about 150 feet down Highway 60), the picketers agreed to move to the Lynch Construction entrance. The Greenbrier's security director was present during this discussion and remained in the vicinity of the picketers even after they moved to the Lynch Construction entrance.

Although Lynch Construction was performing work on the Greenbrier's property, the Union was not picketing the Greenbrier. The Greenbrier hires several hundred employees who are represented by nearly a dozen different labor unions but none from the Union in question. Thus, these picketers were not employees of the Greenbrier.

Meanwhile, the White Sulphur Springs police officer returned to the police station and informed two of his superior officers about the picketing. After determining that the picketers needed to obtain an assembly permit, the three officers proceeded to the Greenbrier's property. Once they arrived, the junior officer controlled traffic on the highway, and the senior officers informed the picketers that they were violating White Sulphur Springs' assembly code by not having a permit. The officers directed the picketers to leave the premises or face arrest, and the picketers peaceably left the premises. As the officers left the area, they reported to the Greenbrier's security director, who was still monitoring the picketing, that they had advised the picketers about the city's assembly permit requirement.

After leaving the premises on June 20, the Union attempted to apply for a permit. A permit application must be submitted five days before the planned assembly and requires approval by the police chief. One reason for requiring an application several days in advance is to allow the police chief to assess whether the city has adequate manpower to maintain traffic safety. Under the city code, the police chief has discretion to deny an assembly permit. Because the police chief was scheduled to be out of town for several days and also because the Union believed it had a right under both the First Amendment and the Act to picket, the Union decided to resume picketing without a permit at the Lynch Construction entrance four days later on Monday, June 24.

During the Monday morning commute, approximately five Union members picketed at the Lynch Construction entrance. When the police chief returned to work that morning, two security officers from the Greenbrier arrived at the police station to inform him that the picketers had returned. According to the chief, the Greenbrier's security officers "were worried about the traffic and stuff, because like I said, that time in the morning, traffic is bad." J.A. 192. The chief promptly went to the scene and determined that the picketing posed a traffic safety concern. The police chief told the picketers to leave because they did not have a permit. One of the Greenbrier's security officers was standing next to the chief when the chief addressed the picketers.

As the police chief was talking with the picketers, the attorney for the Union arrived. The chief drove the Union attorney back to City Hall to discuss the situation with the city's attorney. The city attorney directed the chief to allow the picketers to proceed without a permit.

Later that same day, the Greenbrier's attorney faxed a letter to the city attorney requesting that the city enforce the assembly permit requirement. The Greenbrier's attorney cited the 55 m.p.h. speed limit and the picketers' proximity to the highway as reasons for requiring the permit, emphasizing that the Greenbrier's "overriding concern is public safety." J.A. 324.

In his response, the city attorney explained that the permit was not required because there were so few picketers at the site. The city attorney also expressed doubt whether the right-of-way was within the city's jurisdiction.

## II.

The ALJ decided that the Greenbrier interfered with the Union's right to picket on June 24 by contacting the police, which he found was for the purpose of seeking the removal or arrest of the picketers.[2]

---

[2]The ALJ also determined that the Greenbrier violated the Act on June 20, but the Board declined to review that decision, determining that any violation of the Act on that date would be cumulative to the violation on June 24. No party has petitioned us to review the claim that the Greenbrier violated the Act on June 20, so we have no occasion to address that portion of the ALJ's decision.

The majority of the three-member panel of the Board adopted the ALJ's decision based on what it characterized as the "well settled" rule that an employer's exclusion of union representatives from public property violates § 8(a)(1) of the Act if the union representatives are engaged in an activity, such as picketing, that is protected under § 7. The dissenting member of the panel concluded that the Greenbrier lawfully contacted the police based on its reasonable concern about public safety on the highway.

### III.

The Board's findings of fact are conclusive if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490-91 (1951); *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 742 (4th Cir. 1998). Even though we might reach a different result after hearing the evidence in the first instance, we defer to the Board's findings of fact that are supported by substantial evidence. *NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir. 1984). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Diesel Co. v. NLRB*, 263 F.3d 345, 351 (4th Cir. 2001) (internal quotation omitted). Determining whether substantial evidence exists requires an objective assessment of the sufficiency of the evidence. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378-79 (1998); *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 514 (4th Cir. 1998).

### IV.

Section 7 of the Act provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." 29 U.S.C. § 158(a)(1).

In finding a violation,[3] the majority of the Board panel relied on

---

[3]The Board's dissenting member would have found no violation. He reasoned that the Greenbrier had a First Amendment right to contact the

what it deemed to be the "well settled" rule stated in *Bristol Farms, Inc.*, 311 N.L.R.B. 437, 437-48 (1993), that an employer violates § 8(a) of the Act when it excludes from public property union representatives who are engaging in activities, such as picketing, that are protected under § 7 of the Act. The facts of *Bristol Farms* do not, however, establish such a far-reaching rule. Instead, *Bristol Farms* addressed the inapposite issue of whether an employer with only a leasehold interest in its premises possessed a sufficient property interest, under California law, to entitle it to exclude nonemployee union representatives from private property in front of its nonunion store.

The Greenbrier argues, based on the more recent Board decision in *Victory Markets, Inc. d/b/a Great American*, 322 N.L.R.B. 17 (1996), that contacting the police and the city attorney on June 24 did not violate the Act. We agree with the Greenbrier that, under the circumstances, it did not violate the Union's rights under § 7 by reporting its concern about the traffic to the police and by asking the city to enforce the assembly permit requirement.

The nonemployee picketers in *Great American* were stationed on a grassy strip along the curb of a city street near one of the entrances to the employer's supermarket. The picketers offered handbills to the people in cars as they entered the supermarket parking lot. The picketers were not protesting any unfair labor practice by the supermarket but were instead protesting the building contractor's hiring nonunion

---

police with respect to its reasonable concern about traffic safety. The Board argues that we do not have jurisdiction to reach this constitutional argument because the Greenbrier did not specifically argue a First Amendment right before the Board, despite the fact that it was raised by the dissenting member and was responded to by the majority. Because we rest our opinion on another ground, we need not decide whether the Greenbrier's conduct on June 24 was also protected under the First Amendment. We note, however, that the Supreme Court has extended First Amendment protections to employers who have petitioned the government against union members exercising their § 7 rights. *See BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (recognizing the right to petition as one of the most precious liberties protected by the First Amendment); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983).

employees to renovate the supermarket. After observing that the pick-eters were causing traffic to back up on the street in front of the store, the manager of the supermarket demanded that the picketers leave the premises and summoned the police. The police directed the picketers to leave or face arrest. The picketers left peacefully. *Great American*, 322 N.L.R.B. at 20.

The union filed a charge against the supermarket, alleging that it interfered with its right under § 7 of the Act to lawfully picket. It claimed that the employer violated the Act by demanding that they leave the premises, by summoning the police, and by having the police threaten them with arrest. *Great American*, 322 N.L.R.B. at 17. In considering whether the employer's alerting the police to the traffic situation was permissible, the Board found no violation because the evidence showed that the picketers caused traffic to back up on the city street. Thus, the employer was justified in contacting the police to effect the removal of the picketers because they were creating a *potentially* dangerous traffic condition.[4] *Id.* at 21.

In this case, the majority of the Board panel concluded that the

---

[4]In determining that the employer did not violate the Act in *Great American*, the Board also found that the picketers infringed the super-market's private property interest by not allowing the supermarket's cus-tomers unimpeded entry onto the parking lot. 322 N.L.R.B. at 21. It is unclear in *Great American* — and in this case — whether the Board would have required the employer to show *both* a potentially dangerous traffic condition and some infringement of a private property interest before allowing the employer to contact the police without violating the Act. To the extent that the Board's ruling in this case is read to require that the Greenbrier had to establish both elements, we conclude that such a requirement would be irrational and an unreasonable construction of the Act. *See Beverly Enters., Va., Inc. v. NLRB*, 165 F.3d 290, 296 (4th Cir. 1999) (ruling that a Board's legal conclusions will not be upheld if they are irrational or inconsistent with the Act). It would be irrational to suggest that an employer who observes a potentially dangerous traffic condition on public property cannot call the police until the traffic condi-tion actually infringes the employer's private property interest. When such a potentially dangerous traffic condition exists, especially one that would endanger disinterested third parties, the Act cannot be read to pre-vent the employer from alerting law enforcement authorities.

Greenbrier was not justified in contacting the police because it failed to show that the picketing caused a potentially dangerous traffic condition.[5] We conclude that the majority's finding is not supported by substantial evidence.

It is beyond question that the picketing by the Union posed, at a minimum, a potentially dangerous traffic condition.[6] An objective assessment of the evidence in the record gives rise to only one inference: the Union's picketing made the stretch of Highway 60 adjacent to the Greenbrier's property and entrances more prone to congestion and the possibility of traffic accidents.

The police chief testified extensively before the ALJ that Highway 60 can be a dangerous roadway. This two-lane U.S. highway is one of the major thoroughfares in the county and is especially congested during morning and afternoon commutes. In the decade before the White Sulphur Springs police department began monitoring this stretch of road, there were numerous traffic fatalities. Even more telling were photographs of the picketing that were introduced into evidence at the administrative hearing. These photographs show that the picketers were stationed just inches off the roadway and mere feet from the Lynch Construction entrance. The picketers bore signs that were clearly intended to be read by motorists approaching from both

---

[5]The majority of the Board panel also found that the Greenbrier failed to show that the picketing caused an *actual* traffic problem like the cars backing up on the street in *Great American*. We agree. However, *Great American* cannot be read to require a showing of an *actual* traffic problem before an employer is justified in contacting the police. Such a requirement would place the employer in the untenable position of waiting for a demonstrable traffic hazard on the roadway to develop before contacting the police. The potential for physical injury — like the potential that existed in this case — clearly suffices to allow an employer to request that the police address the situation.

[6]Indeed, it is arguable that the potential for danger in this case was even greater than in *Great American*. For instance, there is no indication in *Great American* that the picketers displayed signs for motorists passing by on the city street to read. Instead, the picketers handed informational leaflets to individuals in their vehicles as they entered the employer's parking lot. In this case, the picketers intended motorists traveling 55 m.p.h. on a two-lane, congested highway to read their signs.

sides of the entrance. It is readily foreseeable that passing motorists attempting to read the signs or simply distracted by the presence of the picketers so close to the roadway would slow down considerably from the posted 55 m.p.h. speed limit and pay attention to the picketers rather than the roadway and other traffic. Making this potentially unsafe area even more dangerous was the fact that construction vehicles were entering and exiting this entrance. In addition, on both June 20 and 24, the picketers were in place during the morning commute when the traffic on the highway is most congested, heightening even more the potential for serious harm. The police chief's unchallenged testimony sums up the potential for harm: "When you have [picketers] alongside the road . . ., if [motorists are] gawking off and looking off to the side, someone stops in front of them, . . . you have a bad accident there." J.A. 175.

Faced with this potentially dangerous traffic condition, the Greenbrier was justified in contacting the White Sulphur Springs police and seeking to have them address the situation. The determination whether the picketers would be required to leave the site was left to the discretion of the police and the city government.[7] In sum, the Greenbrier did not violate § 8(a)(1) by merely requesting that local law enforcement officials assess the situation and take appropriate action.[8]

---

[7]It is irrelevant that the city ultimately decided not to enforce the assembly permit requirement against the Union and instead allowed the Union to continue picketing. Whether the city made the proper decision in applying its assembly code does not diminish the indisputable fact that a potential for physical harm existed.

[8]The Board suggests that the Greenbrier's attempt to have the city enforce the assembly permit requirement was some sort of subterfuge for actually getting the picketers removed from the right-of-way. There was no subterfuge. There is no guarantee that just because an entity applies for a permit that the police chief will approve it. The city code requires the applicant to submit salient information so that the police chief can fairly decide "whether a permit should be issued." J.A. 328. In effect, the Greenbrier merely requested that the city decide whether to approve or deny the permit, a decision that should, according to the provisions of the city code, take into account whether the picketers were causing a potentially dangerous traffic condition and whether such danger could be alleviated through the permitting process.

## V.

We conclude that the Board's finding that the Union's picketing did not cause a potential traffic problem is not supported by substantial evidence. Because a potentially dangerous traffic condition existed, the Greenbrier was justified in contacting the city authorities. Thus, we grant the Greenbrier's petition for review and reverse the Board's decision. We also deny the Board's cross-application for enforcement of its order.

*PETITION FOR REVIEW GRANTED, AND CROSS-APPLICATION FOR ENFORCEMENT DENIED*

DIANA GRIBBON MOTZ, Circuit Judge, concurring:

Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7 of the Act. *See* 29 U.S.C. § 158(a)(1)(2000). "It is beyond question that an employer's exclusion of union representatives from public property violates Section 8(a)(1), so long as the union representatives are engaged in activity protected by Section 7 of the Act." *Bristol Farms, Inc.*, 311 N.L.R.B. 437, 437 (1993).

Greenbrier initially contends that it did not engage in "*employer[ ]* exclusion," *id.* (emphasis added), of Union representatives because it merely alerted the police to their picketing and "left the matter of how to handle the pickets . . . in the hands of the police." Brief of Appellant at 21. While Greenbrier employees never directly told the police to remove the picketers, they notified the police of the picketers' presence on two separate occasions, continued to monitor the picketers after the police had been notified, photographed the picketers, took notes on their activities, and even accompanied the police when speaking with the picketers. Moreover, after the city had decided not to enforce the present ordinance, Greenbrier's attorney directly urged the police to do so. Although the city ultimately made the decision as to enforcement, this activity suffices to establish that Greenbrier "initiat[ed] a chain of events that culminated in the attempted removal of nonemployee union representatives," which constituted an "employer

exclusion" of these representatives under § 8(a)(1). *See Wild Oats Markets, Inc.*, 336 N.L.R.B. 179, 180 (2001).

This does not, however, carry the day for the Union. Although it is a very close question, Judge Shedd's fine opinion has persuaded me that we must nonetheless grant Greenbrier's petition for review. The National Labor Relations Board recognizes that an employers' "exclusion" is justified when it involves summoning the police to remove nonemployee union representatives whose activities are shown to "creat[e] a potentially dangerous traffic condition." *Victory Markets, Inc. d/b/a Great American*, 322 N.L.R.B. 17, 21 (1996). Here, as Judge Shedd notes, the picketing unquestionably posed a potentially serious traffic condition; the activity involved the use of distracting signs along a two-lane U.S. highway that is one of the county's major thoroughfares, during the congested morning commute. Because safety concerns were genuine, Greenbrier's request that local law enforcement officials assess the situation cannot be dismissed as subterfuge. These very real traffic safety concerns justified Greenbrier's contact of local law enforcement so that it could make an independent assessment of public safety and reach a decision regarding the picketing activity. *See id.* Greenbrier's actions cannot, therefore, be deemed to violate § 8(a)(1). *Id.*

For these reasons, I concur in the court's judgment granting Greenbrier's petition for review and denying the Board's cross-application for enforcement.