Dale SCHNECK, Plaintiff,

v.

SAUCON VALLEY SCHOOL DISTRICT, Defendant.

No. Civ.A. 01–CV–5162.

United States District Court, E.D. Pennsylvania.

Oct. 18, 2004.

A. Martin Herring, A. Martin Herring & Assoc., Stephen J. Springer, Philadelphia, PA, for Plaintiff.

Michael I. Levin, Michael I. Levin and Associates, P.C., Allison C. Snyder, Levin Legal Group, P.C., Huntingdon Valley, PA, Mark W. Voigt, Frank & Rosen, Elkins Park, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### I. Introduction

Plaintiff Dale Schneck ("plaintiff" or "Schneck") brings this action against the Saucon Valley School District ("defendant" or "School District" or "District") alleging violations of his First Amendment rights under 42 U.S.C. § 1983, as well as violations of state law. Presently before me is defendant's motion for summary judgment with respect to plaintiff's First Amendment retaliation claim. I will grant the motion.

### II. Statement of Facts [1]

Schneck was formerly a teacher at Saucon Valley High School ("High School") in the Saucon Valley School District in Northampton County, Pennsylvania. (Pl.'s Chronology at 1.) He began work in the District in 1987 as a long-term substitute teacher at the junior high school, but in 1990 was transferred to a full-time position in the High School teaching college preparatory English and journalism. (Id.) In September 1992, Schneck began teaching a second journalism class at the High School focused on production of a school newspaper, *The Panther Press*, and served as the faculty advisor to the newspaper from then until April 1998. (Id. at 1–3.)

On March 31, 1998, the first in a series of events that became collectively known as "Pennygate" occurred. On that day, a student in Schneck's newspaper journalism class suggested that the newspaper write a story about the High School cafeteria's practice of not giving penny change on certain purchases. (Id. at 2.) Later that day, while waiting in the cafeteria checkout line, Schneck noticed that the cafeteria cash register did not contain pennies. (Id.) Schneck spoke with the cashier regarding the penny policy. (Id.) The cashier referred Schneck to her supervisor. Following a discussion with Schneck regarding the penny policy, the supervisor reported the discussion to the High School's Business Manager, Mary Curtin ("Curtin"). (Def.'s Mot. Summ. J. Ex. 19 at 37–38.)

On April 1, 1998, the High School's Principal, Curtis Dietrich ("Dietrich"), scheduled a meeting with Schneck and Curtin to discuss the incident in the cafeteria. (Pl.'s Chronology at 2.) At the meeting on April 2, 1998, Dietrich informed Schneck, with Curtin present, that a cafeteria employee had complained that Schneck had yelled at her. (Id.) When Schneck asked the identity of the cafeteria employee, Dietrich refused to identify the individual. (Id.) Upon Dietrich's refusal, Schneck refused to continue with the meeting. (Id.)

The following day, April 3, 1998, Dietrich again asked Schneck to meet with him, but Schneck refused to meet unless Dietrich would agree to certain conditions. (Id.)

That same day, Schneck posted a statement on the unofficial website of Saucon Valley High School. (Id.; Def.'s Chronology at 2; Def.'s Mot. Summ. J. Ex. 23.) In

---

1. The facts are stated in the light most favorable to plaintiff, the non-moving party.

that statement, he expressed his displeasure with both the penny policy and how the Administration had chosen to treat him after questioning the policy.[2] (Def.'s Mot. Summ. J. Ex. 23.)

On April 8, 1998, Superintendent Ralph Tarola ("Tarola") sent Schneck a memorandum scheduling a meeting for April 16 to discuss the conversation that Schneck had with the cafeteria workers. (Pl.'s Chronology at 2.)

On April 10, 1998, *The Valley Voice*, a local newspaper circulated in the Saucon Valley area, published a letter to the editor written by Schneck. (*Id.*) In the letter, Schneck again voiced his opposition to the cafeteria's policy of not giving penny change to students, but focused primarily on his objections to the way in which he was treated following his inquiry into the practice. (Def.'s Mot. Summ. J. Ex. 24.)

On April 12, 1998, Schneck sent a written response to Tarola's April 8th memorandum. (Pl.'s Chronology at 3.) In his response, Schneck specified a number of conditions for the meeting. In particular, Schneck stated that he would not attend the meeting or any future meeting unless all of the following conditions were met: 1) the complaining cafeteria workers must be present; 2) two student reporters must be present; 3) the meeting must be tape recorded; 4) Schneck's legal counsel must be allowed to attend; and 5) Bob McHugh, Schneck's co-worker and a member of the professional educators association, must be allowed to attend. (*Id.*)

On April 14, 1998, Tarola notified Schneck that he, acceded to Schneck's requests that McHugh be present and that the meeting be tape recorded. (*Id.*) However, Tarola refused to allow student reporters at a personnel-related meeting. (*Id.*) Tarola's position regarding the complaining workers and presence of legal counsel is unclear from the facts in the record.

Schenk did not attend the scheduled April 16th meeting. (*Id.*)

The following day, *The Valley Voice* published an editorial written by Arthur Joel Katz ("Katz") under the headline "This Saucon Valley penny controversy seems paranoid," which was critical of Schneck and Schneck's April 10, 1998 letter to the editor. (*Id.; Def.'s Mot. Summ. J. Ex. 40.) Katz, who was later elected to the school board, was a reporter at the time of the editorial's publication and has been known to socialize with District officials. (Pl.'s Mem. Opp. Summ. J. at 42–32 n. 12.)

---

2. That statement reads in full:

[I appreciate] the support I have received from students ripped off by an arrogant cafeteria system that ignores basic rules of commerce. Students are not, and should not be treated as if they were second class citizens. What I find even more disturbing is that I am now being accused of "yelling" at the cashier for asking a question and expressing my view. Those who know me know that I rarely raise my voice. But some people equate "yelling" with disagreeing with them. That the administration will not permit me to have student newspaper editors sit in on a meeting to discuss my "behavior," when the entire issue affects those students, sounds a lot like the operations of a fascist regime. I will not cooperate with those who attempt to divert attention from the real problem and blame the messenger who discovered it.

Just as much as I believe in Free Speech do I believe that these assaults on students' rights are intolerable. Former grads have already informed me that the "penny" policy has been going on for years. But that issue is only the tip of an iceberg I fully expect to expose. What truly baffles me is why any group of adults would think this unfair treatment of students is acceptable.

I will not cooperate with any administrators who try to hide the public's business behind closed doors in witch-hunt fashion. We have had way too much of that already in this district. -Dale Schneck
(Def.'s Mot. Summ. J. Ex. 23.)

On April 20, 1998, Principal Dietrich sent a letter to students apologizing for the cafeteria's penny practice and offering to make restitution to any student affected by the practice. (Pl.'s Chronology at 3.)

Two days later, Tarola sent a second memorandum to Schneck scheduling a meeting for April 24, 1998 and warning Schneck that his refusal to attend the meeting could result in dismissal. (*Id.*) Schneck did not attend the meeting on April 24, 1998. (*Id.*) Following Schneck's non-appearance, Tarola suspended Schneck without pay pending a School Board hearing on dismissal charges. (*Id.*)

On April 27, 1998, approximately 150 students peacefully demonstrated in the High School's parking lot in protest of Schneck's suspension. (*Id.* at 4.) Roughly 30 of the protesting students refused to return to class and were suspended for three days. (*Id.*) Schneck was not involved in organizing this protest. (*Id.*)

Between April 27, 1998 and June 3, 1998, Schneck was interviewed on several radio and television shows to discuss "Pennygate," including the student walk-out and his suspension. (*Id.*)

On April 28, 1998, Tarola was quoted in newspaper coverage of the student walk-out. (*Id.*) He was critical of Schneck's refusal to attend the meetings and questioned "what kind of problem-solving techniques he was modeling for the students who respect him." (*Id.*)

On May 1, 1998, the School Board President issued a Statement of Charges and Notice of Hearing to Schneck. (*Id.;* Def.'s Mot. Summ. J. Ex. 45.) The Statement charged Schneck with "persistent negligence and persistent and willful violation of official directives and the school laws" in connection with his refusal to attend meetings with his principal and superintendent. (Def.'s Mot. Summ. J. Ex. 45.)

On May 15, 1998, *The Valley Voice* published Schneck's response to Katz's April 17, 1998 editorial. (Pl.'s Chronology at 3.)

On June 3, 1998, Schneck, Tarola, Donald Spry ("Spry"), the Solicitor to the School District, and John Karoly, plaintiff's personal counsel, met to discuss settlement. (*Id.* at 4.) At the meeting, the parties agreed that Schneck would serve a 35-day suspension lasting until the end of the school year in June 1998 and that Schneck would resume teaching in the fall of 1998. (Pl.'s Mem. Opp. Summ. J. at 10.) Tarola also requested, and Schneck agreed, that Schneck's salary during the period of the suspension be paid into a special education fund. (*Id.* at 10–11.)

However, during an executive session of the School Board held on June 15, 1998, the School Board rejected the terms of the settlement and indicated their intent to hold a hearing and decide on appropriate disciplinary action. (Pl.'s Chronology at 5.) Later press reports described the School Board's dissatisfaction with the provision directing Schneck's salary during the suspension towards a charity. (*Id.*)

Following an August 31, 1998 hearing at which Schneck did not appear, the School Board suspended Schneck for the 1998–1999 school year, subject to reassignment in the discretion of the Superintendent upon Schneck's return for the 1999–2000 school year. (*Id.*) As part of the suspension, Schneck was prohibited from setting foot on School District property. (*Id.*) Schneck's union lawyer, Charles Herring ("Herring"), sent a letter to the Board the day of the hearing indicating Schneck's intention to arbitrate any decision made by the School Board. (*Id.*)

Sometime during September 1998, Schneck heard from an unidentified teacher that Tarola had made a joke or mocking reference to Schneck during a staff orientation. (*Id.*)

On June 5, 1999, Arbitrator Joe Bloom conducted the first arbitration session. (Pl.'s Mem. Opp. Summ. J. at 15.) He held a second session on August 25, 1999. (Pl.'s Chronology at 6.)

Sometime between July 1 and July 7, 1999, Tarola informed Schneck by telephone that Schneck would be reassigned to teach language arts in the Middle School following his return from suspension. (*Id.*) On July 7, 1999, Assistant Superintendent Rick Grove sent a letter to Schneck welcoming him to the Middle School Language Arts program and inviting him to attend team meetings in July and August 1999. (*Id.*)

In a July 22, 1999 letter, the School District offered to settle the arbitration dispute with Schneck by granting him a sabbatical for the 1999–2000 school year. (*Id.*) Schneck rejected the offer through his attorney. (*Id.*)

On August 12, 1999, Schneck submitted a Request for Sabbatical Leave to the School District for the 1999–2000 school year and attached a note from his doctor. (*Id.*) Tarola responded to Schneck's request by letter of August 24, 1999 and advised him that "[p]rior to approving a sabbatical leave for restoration of health, the school district will require [Schneck] to undergo a psychiatric evaluation at school district expense." (Def.'s Mot. Summ. J. Ex. 76.) The School District informed Schneck that it had scheduled an examination for Schneck with Dr. Paul Gross on September 16, 1999 and that Schneck could use his accumulated sick leave up until the Board reconsidered his request following Dr. Gross' evaluation. (*Id.*) School District Policy 438 reserves the right of the School Board "to require a medical examination from an employee requesting a leave for restoration of health." (Def.'s Mot. Summ. J. Ex. 75.) However, it does not appear to have been common practice for the School District to require

an individual requesting a sabbatical for health reasons to submit to an independent medical examination, or even necessarily to provide any medical documentation at all. (Pl.'s Mem. Opp. Summ. J. at 17.)

Schneck did not report to school at the start of the 1999–2000 school year, but continued to be paid bi-weekly sick day payments until his accumulated sick leave was exhausted in February 2000. (Pl.'s Chronology at 6.)

Schneck did not attend the school-scheduled psychiatric examination on September 16, 1999. (*Id.*)

Beginning with the 1999–2000 school year, the High School administration changed Schneck's former newspaper journalism class into an after-school activity. (*Id.*)

On February 11, 2000, in anticipation of Schneck's sick leave running out on February 17, Schneck's union lawyer sent a letter to Spry renewing Schneck's request for a sabbatical. (*Id.* at 7.) He attached to this request a psychiatric evaluation from Dr. David Daley dated December 16, 1999. (*Id.*)

Tarola recommended to the School Board that the sabbatical be approved now that Schneck had provided an evaluation from his own doctor. (*Id.*) However, the School Board tabled this request on February 28, 2000 until Schneck submitted to the independent psychiatric evaluation that the District had originally requested in Tarola's August 24, 1999 letter. (*Id.*)

On April 6, 2000, Schneck filed a *mandamus* action in state court seeking to compel· the School District to grant his sabbatical request. (Def.'s Mot. Summ. J. Ex. 81; Pl.'s Chronology at 7.)

In an April 27, 2000 letter to Schneck's union lawyer Herring, Spry reiterated the School District's position to Herring that the School Board would grant Schneck a

sabbatical if he agreed to be examined by Dr. Gross. (Def.'s Mot. Summ. J. Ex. 83.) Herring responded by letter on May 8, 2000 and indicated that Schneck would "not refuse" to be evaluated by the District's doctor, but insisted that the sabbatical leave "cannot be conditioned upon the evaluation." (Def.'s Mot. Summ. J. Ex. 84.)

At the May 19, 2000 hearing held in the *mandamus* action, the parties agreed to settle the action. (Pl.'s Chronology at 7.) According to the "Notes of Agreement/Adopted Order of the Court," the District agreed to grant Schneck a one-year sabbatical leave retroactive to the date his sick leave was exhausted. (Def.'s Mot. Summ. J. Ex. 85 at 2.) In exchange, Schneck stipulated that the District may exercise its right to require Schneck to submit to a medical exam. (*Id.*) In addition, the District agreed to issue payments due under the agreement in the next pay period, to reimburse Schneck for money spent on medical benefits, and to make any necessary adjustments to Schneck's prior sick leave distributions to reflect the correct per diem rate. (*Id.*) Finally, the parties agreed to "reserve all rights raised in their respective pleadings as well as other legal rights they may have in the event of future disputes." (Def.'s Mot. Summ. J. Ex. 85 at 2–3.)

On May 30, 2000, the Arbitrator issued a decision in favor of Schneck in his challenge to his 1998–1999 suspension. (Pl.'s Chronology at 7.) The Arbitrator found that Schneck "[c]learly ... was insubordinate, which is a serious offense and worthy of a serious penalty." (Def.'s Mot. Summ. J. Ex. 64 at 9.) However, "in light' of the circumstances of the insubordination, and considering that [Schneck] had no history of discipline and was regarded by his superiors as a good teacher," (*id.* at 10), the Arbitrator found that "a penalty of a 220 day suspension was far in excess of the seriousness of [Schneck's] offense." (*Id.*) The Arbitrator found that "at maximum a suspension of thirty days would have been appropriate." (*Id.*) Because the parties had stipulated that the Arbitrator could not modify the penalty, the Arbitrator found that the District had not shown just cause for a 220 day suspension and ordered the District to reimburse Schneck, "without interest, for all pay and benefits lost during his suspension, less any earnings he may have received over the same period." (*Id.* at 1.)

The "Notes of Agreement/Adopted Order of the Court" in the sabbatical action was filed with the court on June 13, 2000. (Def.'s Mot. Summ. J. Ex. 85 at 1.) Spry received the order on June 15, 2000 and forwarded it to Curtin the following day with instructions to reimburse Schneck according to the agreement. (Def.'s Mot. Summ. J. Ex. 86.)

On June 21, 2000, Curtin sent Schneck a check for $7,252.17 to reimburse him for his sabbatical leave back pay. (Pl.'s Chronology at 7; Def.'s Mot. Summ. J. Ex. 87.)

On June 26, 2000 the School Board approved Schneck's sabbatical leave for health reasons for one year beginning retroactively on February 18, 2000. (Pl.'s Chronology at 8; Def.'s Mot. Summ. J. Ex. 88.)

The School Board filed a Petition to Vacate the Arbitration Award in Northampton County Court of Common Pleas on June 29, 2000. (Pl.'s Chronology at 8; Def.'s Mot. Summ. J. Ex. 65.) The School District primarily relied on an argument that the Arbitrator had violated a stipulation between the parties as to the Arbitrator's power to modify Schneck's penalty. (Def.Mot.Summ. J. Ex. 65, Ex. 68.)

Sometime in July 2000, Dr. Gross examined Schneck. (Pl.'s Chronology at 8.) On July 31, 2000, Dr. Gross informed the Dis-

trict that he agreed with Schneck's psychiatrist that Schneck was in need of a sabbatical leave for restoration of health. (*Id.*)

In January 2001, Arthur Katz was appointed to the School Board. (*Id.*)

Anticipating Schenk's return to school, Tarola sent Schneck a letter on January 25, 2001. (Def.'s Mot. Summ. J. Ex. 90.) In the letter, Tarola noted that Schneck was due back from sabbatical on February 22, 2001. (*Id.*) He asked Schneck to contact him prior to his return so that they "might get together with Principal Harry Krammes to discuss [Schneck's] assignment and provide a general orientation for [Schneck's] return to the school setting." (*Id.*) He closed the body of the letter by stating, "I look forward to hearing from you and to your return." (*Id.*)

On February 15, 2001, one week before the expiration of Schneck's sabbatical, Schneck sent a letter of resignation to the School District. (Pl.'s Chronology at 8; Def.'s Mot. Summ. J. Ex. 91.) Schneck noted that "[t]hose who have sought to discredit my professionalism have caused irreparable harm to my career and personal well-being, and at the same time negatively affected the potential for a positive teaching experience in the Saucon Valley School District." (*Id.*) While thanking Tarola for attempting to reconcile their differences in 1998, Schneck explained that "certain school directors have pursued an agenda of relentless harassment and egomaniacal vindictiveness that forces me to resign." (*Id.*)

On June 22, 2001, the Northampton County Court of Common Pleas denied the School District's Petition to Vacate the Arbitration Award. (Pl.'s Chronology at 8; Def.'s Mot. Summ. J. Ex. 68.) The court noted that it found the stipulation entered into by the parties to be "in part, ambiguous." (Def.'s Mot. Summ. J. at 6.) The court concluded that based on its review of the stipulation, "it appears as if the District viewed the Stipulation as limiting the Arbitrator's scope of authority to the issue of whether just cause existed for discipline, while the Association viewed the stipulation as permitting the Arbitrator to determine whether there was just cause for the penalty imposed." (*Id.*) Nevertheless, the court found that "the stipulation clearly gave the Arbitrator the right to decide the issue presented, whether just cause existed for the action of the School Board in disciplining [Schneck]." (*Id.*)

The School District filed an appeal with the Commonwealth Court the following month. (Pl.'s Chronology at 8.) The Commonwealth Court affirmed the lower court's decision on April 10, 2002. (*Id.*)

Schneck and the School District entered in to a settlement agreement, which was approved by the School Board on June 10, 2002. (Def.'s Mot. Summ. J. Ex. 71.) Under this agreement the School District paid Schneck, who owed the School District money based on his refusal to return to work following his sabbatical, a portion of the money awarded to him by the Arbitrator. (*Id.*) Schneck received the payment owed to him under this agreement on June 13, 2002. (Pl.'s Chronology at 8.)

In April 2003, the School District updated Schneck's pay history with the Public Schools Employee Retirement System, which administers teacher's pensions and pension payments in Pennsylvania, to reflect his June 13, 2002 payment. (*Id.* at 8–9.)

Schneck filed his complaint in federal court alleging violations of the First Amendment and state laws on October 11, 2001.

### III. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment should

be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997).

## IV. Discussion

At issue is plaintiff's allegation that defendant violated the First Amendment by retaliating against him for his exercise of First Amendment rights. Defendant has moved for summary judgment on this claim on the following grounds: 1) that plaintiff's claim is barred by the statute of limitations; 2) that plaintiff's claim is barred by claim preclusion and collateral estoppel; and 3) that plaintiff has not presented sufficient evidence of a violation of his First Amendment rights. I find the statute of limitations to be a dispositive ground for granting summary judgment.

■■■ "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare v. New Jersey,* 250 F.3d 188, 194 (3d Cir.2001). "While the government's role as employer ... gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large, this hand cannot act with impunity." *Id.* (internal quotations omitted). The Third Circuit has specified a clear methodology for evaluating a public employee's retaliation claim for engaging in protected activity:

First, plaintiff must establish the activity in question was protected. For this purpose, the speech must involve a matter of public concern. Once this threshold is met, plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. These determinations are questions of law for the court.

If these criteria are established, a plaintiff must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action. Lastly, the public employer can rebut the claim by demonstrating it would have reached the same decision ... even in the absence of the protected conduct. The second and third stages of this analysis present questions for the fact finder.

*Baldassare,* 250 F.3d at 195 (citations and quotations omitted).

■ As noted, the second step in the retaliation analysis requires the plaintiff to show that his protected speech was a substantial or motivating factor in an alleged retaliatory action. Though often not articulated, this step embraces two distinct inquiries: "did the defendants take an action adverse to the public employee, and, if so, was the motivation for the action to retaliate against the employee for the protected activity." *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 800 n. 3 (3d Cir.2000) (Greenberg, J., concurring in part and dissenting in part).

■ The adverse action complained of by a public employee need not amount to actual or constructive discharge in order to be actionable, but conversely, not every public employee's grievance rises to the level of an adverse action. In *Rutan v. Republican Party,* 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Supreme Court recognized that "there are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy." The Court indicated, in dicta, that the First Amendment protects state employees "from even an act of retaliation as

trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights." *Id.* at 76 n. 8, 110 S.Ct. 2729 (internal quotations omitted). *See also Bennis v. Gable,* 823 F.2d 723, 731 (3d Cir.1987) ("[T]he constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible free speech.") Courts in the Third Circuit have found a variety of actions short of discharge to amount to cognizable retaliatory acts. *See id.,* 203 F.3d at 234–35 (retaliatory harassment culminating in retaliatory promotion rankings); *Merkle,* 211 F.3d at 793 (removal from three compensated extracurricular positions); *Anderson v. Davila,* 125 F.3d 148, 160 (3d Cir.1997) (post-employment retaliatory surveillance); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340–50 (D.N.J.1999) (failure to promote and retaliatory harassment); *Vearling v. Bensalem Twp. Sch. Dist.,* No. CIV.A.94–7711, 1997 WL 128096, at *7 (E.D.Pa. Mar. 18, 1997) (campaign of harassment including assignment of dangerous and unnecessary cleaning work, unwarranted reprimands, discipline and performance evaluations, refusal to approve necessary overtime, following and spying, and falsifying attendance records).

However, *de minimis* or trivial acts do not amount to actionable adverse actions. *Brennan v. Norton,* 350 F.3d 399, 419 (3d Cir.2003). The critical question is whether the retaliatory act would be likely to "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000). "[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusation, or verbal reprimands." *Brennan,* 350 F.3d at 419. *See*

*also, e.g., Johnson v. Heimbach,* No. CIV. A.03–2483, 2003 WL 22838476, at *6 (E.D.Pa. Nov. 25, 2003) (evaluations containing false perceptions, derogatory written comments, inadequately grounded conclusions of job effectiveness, and unkind words from colleagues would not deter a person of ordinary firmness from exercising First Amendment rights); *Bradshaw v. Township of Middletown,* 296 F.Supp.2d 526, 542 (D.N.J. Dec. 4, 2003) (public disagreement in the press with plaintiff not sufficient to deter a person of ordinary firmness from exercising his First Amendment rights); *Altieri v. Evanko,* No. CIV. A.98–5495, 2003 WL 22005716, at *19–20 (E.D.Pa. Aug. 1, 2003) (unsuccessful attempt to entrap plaintiff into buying or selling drugs insufficient to chill speech); *Kelleher v. City of Reading,* No. CIV.A.01–3386, 2002 WL 1067442, at *5 n. 6 (E.D.Pa. May 29, 2002) (monitoring and screening of private e-mails and denial of parking permit unlikely to deter a person of ordinary firmness from exercise of protected activity).

## A. Acts Within the Statutory Period

■ Claims brought under section 1983 are governed by the relevant state statute of limitations for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 599 (3d Cir.1998). Pennsylvania's statute of limitations for such actions is two years. 42 Pa. Cons.Stat. Ann. § 5524; *Sameric Corp.,* 142 F.3d at 599. The parties, therefore, do not dispute that two years is the appropriate statute of limitations.

■ Plaintiff filed his complaint in federal court on October 11, 2001. Consequently, claims arising before October 11, 1999 are time barred. "A section 1983 cause of action accrues when the plaintiff

knew or should have known of the injury upon which its action is based." *Sameric Corp.*, 142 F.3d at 599. Many of defendant's alleged retaliatory actions occurred, and plaintiff became aware of their occurrence, well before October 11, 1999. While plaintiff argues that the continuing violations doctrine allows consideration of those pre-October 11, 1999 acts, I will first consider whether plaintiff has alleged any independently actionable conduct within the statutory period.

Plaintiff will not survive summary judgment, absent application of the continuing violations doctrine, unless he can show that there is a genuine issue of material fact as to whether defendant engaged in conduct during the statutory period that is "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Suppan*, 203 F.3d at 235. Plaintiff alleges five retaliatory acts of the defendant occurring after October 11, 1999: 1) the School District's refusal to grant plaintiff a sabbatical in February 2000 and concomitant non-payment of sabbatical benefits through June 2000; 2) the District's delay in formally approving plaintiff's sabbatical following their May 19, 2000 settlement of the issue; 3) the District's "bad faith" filing of a Petition to Vacate Arbitration Award and subsequent appeals; 4) the District's delay in paying plaintiff's salary and fringe benefits due to plaintiff following the District's unsuccessful challenges to the Arbitration award;

and 5) plaintiff's "constructive discharge" on February 15, 2001.[3] (Pl.'s Sur. Def.'s Mot. Summ. J. at 25–28.) I must also consider whether these acts, taken as a whole, could be sufficient to deter a person of ordinary firmness from the exercise of First Amendment rights.

### 1. Refusal to Grant Sabbatical.

■ Plaintiff argues that the District's continued refusal to grant plaintiff a sabbatical constitutes an affirmative retaliatory act taking place within the statutory period.[4] When evaluating the timeliness of plaintiff's claims, "the proper focus is upon the time of the *discriminatory* acts, not upon the time at which the *consequences* of the acts became most painful." *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). The limitations period is triggered "when the employer ha[s] established its official position and ma[kes] that position apparent to the employee by explicit notice." *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1416–17 (3d Cir.1991). "An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination. If it were, then an employee could avoid the [limitations period] by filing a series of appeals or fresh requests." *Lever v. Northwestern Univ.*, 979 F.2d 552, 556 (7th Cir.1992). *See also Masco v. United Airlines*, 574 F.2d 1127, 1130–31 (3d Cir.1978) (refusals to reinstate employ-

---

**3.** In his amended complaint, plaintiff only clearly alleges the refusal to grant the sabbatical and the bad faith appeals as actionable conduct, but in his briefs in opposition to summary judgment, plaintiff also alleges the delay in approving the sabbatical, the delay in paying the arbitration award, and constructive discharge. As none of these alleged acts are sufficient to save plaintiff's claim, I will treat each as properly raised for purposes of this motion.

**4.** Plaintiff alleges for the first time in his memorandum of law in opposition to summary judgment that defendant's refusal to grant plaintiff's sabbatical was a retaliatory act not only with respect to plaintiff's free speech, but also "for Plaintiff['s] failing to withdraw his arbitration case," which plaintiff alleges constitutes a violation of his First Amendment right to petition. Because I find that regardless of defendant's motivation, the act of refusal did not take place within the statutory period, this new claim is of no consequence.

ees not separate acts of discrimination); *Stewart v. Booker T. Washington Ins.,* 232 F.3d 844, 853 (11th Cir.2000) ("An employer's refusal to undo a prior discriminatory act is not, in itself, a new act of discrimination."); *Keene v. Costle,* 589 F.Supp. 687 (E.D.Pa.1984) (denial of request to reconsider denial of within-grade increase not actionable).

■ It is undisputed that the District denied Schneck's sabbatical request on August 24, 1999, when Tarola sent Schneck a letter informing him that the District would not grant a sabbatical unless Schneck submitted to a psychiatric exam at school district expense. At the very latest, Schneck admits that he knew of this denial when he was put on sick leave in September 1999. (Def.'s Mot. Summ. J. Ex. 6 at 83.) Plaintiff argues that because he provided a medical evaluation to the Board from his own doctor, this was "substantial compliance" with the District's requirement of an independent medical examination. But it is undisputed that in August 1999, the Board decided to require an *independent* medical examination of Schneck. While that requirement may have been imposed for retaliatory reasons, the Board's subsequent decision to table Schneck's renewed request on the ground that Schneck had not yet fully complied with the original requirement is not a "fresh" retaliatory act. Tarola's recommendation to the Board that it grant Schneck's renewed request is perhaps evidence that the Board's original demand of an independent evaluation was not in good faith, but it does not convert the Board's unchanged position into an affirmative act of retaliation. Likewise, the fact that the District did not make sabbatical leave payments during this period is nothing more than the consequence of the Board's prior allegedly discriminatory acts.

Defendant relies on *Cardenas v. Massey,* 269 F.3d 251, 255–57 (3d Cir.2001), where the Third Circuit characterized each of a series of discriminatory paychecks as a distinct violation of the plaintiff's right to nondiscriminatory compensation, even though the disparate pay stemmed from a pre-limitations period pay-grade classification. The *Cardenas* court appeared to adopt the plaintiff's framing of the disparate pay as an ongoing decision not to increase the plaintiff's wage level to one appropriate to his skills. *Id.* at 257. While in some respects any failure to act or failure to reconsider an earlier decision might be characterized as a decision "made on an ongoing basis," *id.,* in the instant case, the failure to approve plaintiff's renewed sabbatical request and concomitant nonpayment of benefits are more properly characterized as neutral reliance on a discrete decision made prior to the statutory period. Claims are barred "where the relevant aspect of the employment system (such as promotion, seniority, or termination) is facially neutral, and any discrete discriminatory conduct took place and ceased outside the period of limitations." *Cardenas,* 269 F.3d at 256.

**2. Delay in Formally Approving Plaintiff's Sabbatical Following Settlement.**

■ Regardless of the District's initial refusal to grant plaintiff's sabbatical, plaintiff argues that the District's delay in formally approving the sabbatical and issuing back pay owed to plaintiff following their settlement of the sabbatical issue constitutes a retaliatory act within the statutory period. The parties agreed to settle the sabbatical issue at the *mandamus* hearing on May 19, 2000. Schneck did not receive his sabbatical leave back pay until June 21, 2000 and the School Board did not formally approve Schneck's sabbatical until June 26, 2000. Even if a one-month delay is otherwise suggestive of retaliatory intent, closer examination of the undisputed facts

reveals that these cannot be characterized as retaliatory acts "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Suppan*, 203 F.3d at 235. It is undisputed that the settlement agreement was not filed with the court as an Adopted Order until June 13, 2000, that defendant's lawyer received the Order on June 15, 2000, and that he forwarded it to the High School's business manager on June 16, 2000. There is simply nothing suspicious about defendant waiting to receive a finalized and official version of the settlement agreement before acting on it. Plaintiff thus complains of a five to ten day processing period in the District's handling of his back pay and sabbatical approval. It would "trivialize the First Amendment" to find that such a delay was actionable as a violation of plaintiff's First Amendment rights. *Suppan*, 203 F.3d at 235. Such action cannot be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. *Id.*

### 3. "Bad Faith" Challenges to the Arbitration Award

Plaintiff alleges that the District filed a Petition to Vacate the Arbitration Award and subsequently appealed the award's affirmance as a means of retaliating against plaintiff for his exercise of free speech. He argues that these challenges were made in a bad faith attempt to punish plaintiff for his speech and with no realistic hope of success.

■ Under certain conditions, the filing of a lawsuit may be considered a retaliatory act. *See Bill Johnson's Rest., Inc. v. NLRB*, 461 U.S. 731, 740–43, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("[a] lawsuit no doubt may be used by an employer as a powerful instrument of coercion or retaliation" and can have a "chilling effect ... upon an employee's willingness to engage in protected activity," but only suits lacking a "reasonable basis" may be enjoined by the NLRB); *BE & K Construction Co. v. NLRB*, 536 U.S. 516, 536–37, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (the NLRB may not impose liability on an employer for filing a retaliatory lawsuit, absent a finding of objective baselessness); *Ward v. Wal–Mart Stores, Inc.*, 140 F.Supp.2d 1220 (D.N.M.2001) ("the filing of frivolous lawsuits may constitute an adverse employment action for purposes of a retaliation claim [under the ADA]"); *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F.Supp.2d 756, 758 (N.D.Ohio 1999) (a bad faith counterclaim motivated by retaliation can form the basis of a claim under Title VII).[5]

■ As a general matter, however, the filing of a lawsuit is itself petitioning conduct protected by the First Amendment and may not be the basis for liability under the *Noerr–Pennington* doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("*Noerr*"); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14

---

**5.** It is true that the Fifth Circuit has held that an allegedly retaliatory counterclaim does not constitute an "ultimate employment decision that will support a finding of retaliatory conduct" under Title VII. *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir.2003). However, it is clear that for purposes of First Amendment retaliation cases, even for those originating in the public employee context, the retaliatory act need not be employment-related at all. *See Anderson*, 125 F.3d at 160 (post-employment surveillance undertaken in retaliation for exercise of First Amendment rights was actionable conduct under section 1983). Thus, the Fifth Circuit's reservation about whether a retaliatory counterclaim constitutes an "ultimate employment decision" for purposes of Title VII is inapposite.

L.Ed.2d 626 (1965) (*"Pennington"*); *Herr v. Pequea Twp.*, 274 F.3d 109, 116 (3d Cir.2001) (questioned on other grounds by *United Artists Theatre Circuit, Inc. v. Twp. Of Warrington*, 316 F.3d 392, 400 (3d Cir.2003)) ("principles relied upon [under *Noerr–Pennington* doctrine] not limited to antitrust liability"). By alleging "bad faith" on the part of defendant, plaintiff appears to argue that defendant's litigation efforts fall within the "sham" exception to *Noerr–Pennington* immunity. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (*"PRE"*). This argument merits further inquiry.

### a. Applicability of *Noerr–Pennington* Immunity

 The *Noerr–Pennington* doctrine originated in the antitrust context and simply recognizes that the First Amendment protects individuals and entities from being penalized for exercising their First Amendment right to petition the government. "The First Amendment right to petition extends to all departments of government including administrative agencies and the courts." *Herr*, 274 F.3d at 115 (citations omitted)). "While the right to petition conferred by the First and Fourteenth Amendments does not provide an absolute immunity from liability for actions based on petitioning activity, the Supreme Court has held that such liability cannot be imposed in the absence of a finding that the position taken lacked any reasonable basis." *Id.* In particular, the Supreme Court has set out a two-part definition for "sham" litigation that is not protected by the immunity:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable out-

come, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon.

*PRE*, 508 U.S. at 60–61, 113 S.Ct. 1920 (citations omitted).

 The Third Circuit has squarely held that *Noerr–Pennington* immunity protects the petitioning activity of public entities, at least so long as the protected petitioning activity constitutes the petitioning of a distinct public entity authorized by state law to resolve the issue at stake. *Herr*, 274 F.3d at 119; *Mariana v. Fisher*, 338 F.3d 189 (3d Cir.2003); *see also Manistee Town Center v. City of Glendale*, 227 F.3d 1090 (9th Cir.2000). The immunity applies outside of the antitrust context as a defense to § 1983 civil rights actions. *Herr*, 274 F.3d at 119; *see also Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 158 (3d Cir.2001); *Barnes Found. v. Twp. of Lower Merion*, 927 F.Supp. 874, 876–78 (E.D.Pa.1996). Thus, because the School District's appeals of the Arbitrator's award clearly constitute petitioning of a distinct public entity authorized by state law to resolve the issue at stake, its protected actions may not form a basis for § 1983 liability, unless they fall within the "sham" exception to *Noerr–Pennington*.

### b. The "Sham" Litigation Exception to *Noerr–Pennington* Immunity

As noted earlier, in *PRE*, the Supreme Court defined the "sham" exception to

*Noerr–Pennington* immunity to include "only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process." *BE & K Construction Co.*, 536 U.S. at 537, 122 S.Ct. 2390 (Scalia, J., concurring). The Third Circuit in *Herr* noted a distinction between the test laid down in *PRE* and the Third Circuit's prior precedent of *McArdle v. Tronetti*, 961 F.2d 1083 (3rd Cir.1992). In *McArdle*, the plaintiff alleged that the defendant prison counselor had violated the plaintiff's due process and equal protection rights by filing an involuntary commitment petition with respect to the plaintiff. *Id.* at 1086. The court in *McArdle* found that plaintiff prisoner's claim amounted to a claim of malicious use of civil process by state actors in violation of his Fourteenth Amendment rights and that plaintiff could state such a claim under section 1983 only "if it includes the elements of that common law tort as it has developed." *Id.* at 1088. "This includes the requirement that the [petitioning activity was] without probable cause and primarily for a purpose other than securing the proper adjudication of [the] claim." *Herr*, 274 F.3d at 118 (interpreting *McArdle* ). The *Herr* court, referring to Justice Souter's concurring opinion in *PRE*, noted that while the first element of *PRE' s* test is "wholly objective-liability may be imposed only if no reasonable litigant could realistically expect to secure favorable relief[,][t]he common law's 'probable cause' may have a subjective component-the defendant must reasonably believe that there is a sound chance that his claim may be held legally valid." *Id.* (citations omitted).

In the instant case then, under the *PRE* standard, plaintiff can survive summary judgment only if: 1) *in a purely objective sense* "no reasonable litigant could realistically expect success on the merits" in defendant's challenges to the arbitration award; and 2) there is a genuine issue of material fact as to defendant's subjective motivation. *PRE,* 508 U.S. at 60, 113 S.Ct. 1920. Under the *McArdle* standard, if, as the *Herr* court suggested, there is indeed a subjective component to common law probable cause, plaintiff can survive summary judgment if he can show: 1) *either* that defendant objectively *could not* have reasonably believed there was a sound chance that his claim may be held legally valid *or* that there is a genuine issue of material fact as to whether the defendant *in fact* believed there was such a chance; and 2) there is a genuine issue of material fact as to whether defendant challenged the award primarily for a purpose other than securing the proper adjudication of the claim. *Herr,* 274 F.3d at 118; *McArdle,* 961 F.2d at 1088. The court in *Herr* did not resolve this distinction, finding in that case, as in most cases, that it was "a distinction without a difference" because "[i]f a person has undertaken to participate in civil proceedings and the circumstances are such that he *could* have a reasonable expectation that he *may* succeed, it will be the rare case indeed in which he does not actually have that expectation." *Id.*

■ In this case, too, the difference, if any, between *McArdle' s* requirement of an absence of probable cause and *PRE' s* requirement of objective baselessness, is a "distinction without a difference." *Id.* Under either test, I must first inquire into the objective reasonableness of defendant's Petition to Vacate the Arbitration Award and subsequent appeals. "Where, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." *PRE,* 508 U.S. at 63, 113 S.Ct. 1920. The crux of the School District's challenge to the arbitrator award lay in its interpretation of the stipulation entered into by the parties at the arbitration hearing. On the first day of the arbitration hearing, as recounted in Judge Jiuliante's opinion for

the Commonwealth Court, the following exchange occurred between the School District's lawyer, Mr. Spry, plaintiff's union lawyer, Mr. Herring, and the Arbitrator:

> Arbitrator: The issue . . . is, was there just cause for the disciplinary action taken against [Schneck]? And, if so, what—we'll get in to remedy as the hearing goes on, but I'd just like to state, . . . at this point that the issue is just cause for discipline. Is that correct?
>
> Mr. Herring: That's correct.
>
> Mr. Spry: That's correct.
>
> Arbitrator: Okay.
>
> . . . . .
>
> Mr. Spry: We stipulate that there was a timely grievance. . . . We stipulate that the issue is arbitrable. And the School District's position is, that if the Arbitrator finds just cause, that the remedy has been imposed, and there's no authority to alter the remedy.

(Def.'s Mot. Summ. J. Ex. 70 at 3.)

On the second day of the hearing, the following discussion took place:

> Mr Herring: One procedural issue we left unanswered last time, the question of the Arbitrator's authority to fashion a remedy, whether the Arbitrator has that authority or does not.
>
> . . . . .
>
> Arbitrator: What is the District's position? The Association's position is that I do have the authority or I do not? Tell me where we are.
>
> Mr. Herring: The Association's position is that if the [School District] is willing to agree, then you do have the authority. If the [School District] is not willing to agree, despite the fact that I believe pursuant to law that you do, I will concur with the [School District's] position that it is all or nothing.

> Mr. Spry: The [School District's] position is that the matter is arbitrable and what is before the Arbitrator is the determination of whether or not there was just cause for the discipline, but if the Arbitrator determines that there was just cause, that the Arbitrator does not have the power to alter the remedy that was imposed by the School Board.
>
> Arbitrator: So, your position, Mr. Herring, is that even though you technically disagree with that, you will accept that in this case?
>
> Mr. Herring: Correct.
>
> Arbitrator: So that I do not have the authority to modify the penalty?
>
> Mr. Herring: Correct.
>
> Arbitrator: It is all or nothing.
>
> Mr. Herring: Correct. But I think that the issue needs to be phrased a little differently. I think that is up to you to decide, whether there is just cause for a[220]-day suspension of [Schneck].
>
> Mr. Spry: I have discussed this with Mr. Herring. Our position is the issue as to whether there was just cause for insubordination.
>
> Arbitrator: The penalty is the penalty. The penalty was a [220]-day suspension. As long as you are both clear on that, then I understand what you are saying and we can go forward.

(*Id.* at 3–4.)

The Arbitrator found that Schneck "[c]learly . . . was insubordinate." (*Id.* at 9.) However, "in light of the circumstances of the insubordination, and considering that [Schneck] had no history of discipline and was regarded by his superiors as a good teacher," (*id.* at 10), the Arbitrator found that "a penalty of a 220 day suspension was far in excess of the seriousness of [Schneck's] offense" and that "at maximum a suspension of thirty days would have been appropriate." (*Id.*) In other words,

the Arbitrator concluded that while Schneck's insubordination might have provided "just cause" for a suspension of 30 days, it did not provide "just cause" for a suspension of 220 days.

In its challenge to the Arbitrator's award, the School District argued that the award was not rationally related to the collective bargaining agreement ("CBA") and violated the stipulation between the parties. (Def.'s Mot. Summ. J. Ex. 68 at 5.) The District contended that "the stipulation between the parties established that the Arbitrator would determine only if just cause for the discipline existed, and if so, the District's discipline would remain as imposed." (*Id.*)

The Court of Common Pleas, while denying defendant's Petition, recognized an ambiguity in the original stipulation. Judge Moran noted that "the Stipulation entered into by the parties is, in part, ambiguous. From our review of the Stipulation, it appears as if the District viewed the Stipulation as limiting the Arbitrator's scope of authority to the issue of whether just cause existed for discipline, while the Association viewed the Stipulation as permitting the Arbitrator to determine whether there was just cause for the penalty imposed." (*Id.* at 6.) The court found that "Arbitrator Bloom interpreted the stipulation as requiring him to determine whether the District had just cause to suspend [Schneck] for 210 days," that "the stipulation clearly gave the Arbitrator the right to decide ... whether just cause existed for the action of the School Board in disciplining [Schneck]," and that this type of limitation on his discretion was contemplated by the CBA. (*Id.* at 6–7.) It therefore found that Arbitrator Bloom "resolved the issue presented to him by the parties under the authority of the CBA and in a lawful manner." (*Id.* at 7.)

On appeal to the Commonwealth Court, the School District raised the same issue.

Judge Jiuliante restated the School District's position as follows: "once the Arbitrator found that Schneck engaged in conduct warranting discipline, he was powerless to alter the remedy imposed by the School Board." (Def.'s Mot. Summ. J. Ex. 70 at 5.) The Commonwealth Court noted two Pennsylvania state court decisions which provided support for the School District's position. In particular, Judge Jiulante characterized *Lehigh County Comm. Coll. Faculty Ass'n v. Lehigh County Comm. Coll.,* 653 A.2d 47 (Pa.Cmwlth.1990), *aff'd* 606 A.2d 1169 (Pa. 1992), as holding that "once [the] arbitrator concluded that just cause existed for [the] suspension, he was without authority to reduce [the] length of [the] suspension where [the] parties stipulated that [the] issues were limited to whether just cause existed for [the] suspension and, if not, what was the proper remedy." (Def.'s Mot. Summ. J. Ex. 70 at 5–6.)

However, the Commonwealth Court found the School District's challenge to be more analogous to *Blue Mountain Sch. Dist. v. Soister,* 758 A.2d 742 (Pa.Cmwlth. 2000). In that case, the Commonwealth Court, in reversing the decision of the Court of Common Pleas, which in turn had reversed the arbitrator's award, reasoned that the "discharge for cause" language of the governing CBA and the "just cause" issue presented for arbitration meant that the Arbitrator was to determine whether just cause existed for a dismissal, "not that just cause existed for any form of discipline." (Def.'s Mot. Summ. J. Ex. 70 at 6–7.)

The Commonwealth Court, in evaluating the challenge to Schneck's arbitration award, found that "the Arbitrator interpreted the parties' stipulation to mean that the School District bore the burden of demonstrating that just cause existed for a 220–day suspension; not that just cause

existed for any type of discipline." (*Id.* at 7.) And finding it "evident" from the discussion regarding the stipulation "that the parties anticipated this interpretation," the court ruled that the stipulation prevented the Arbitrator from imposing a lesser penalty, once he had "determined that just cause did not exist for such a severe punishment." (*Id.*) The court therefore affirmed the lower court's decision upholding the Arbitrator's award.

Because there was at least an ambiguity in the stipulation before the arbitrator regarding his authority, and because the Pennsylvania courts appear to have recognized not only the ambiguity but also that there was precedential support for the defendant's position, it cannot be said that "no reasonable litigant" could realistically have expected to secure favorable relief.[6] *Herr*, 274 F.3d at 118; *PRE*, 508 U.S. at 62, 113 S.Ct. 1920. Both the opinion of the Commonwealth Court and the Court of Common Pleas "analyze[d] the issues presented with care and some detail. If either court had viewed [the issue] as frivolous, [I am] confident that some evidence of that view would have found its way into the opinions." *Herr*, 274 F.3d at 119. Defendant's challenges to the Arbitrator's award were not "objectively baseless." *PRE*, 508 U.S. at 60, 113 S.Ct. 1920.

Even if, following my determination of objective reasonableness, an inquiry into defendant's subjective expectation of success remains necessary under *McArdle* and *Herr*, I find that plaintiff has not presented a genuine issue of material fact as to whether defendant *in fact* believed that there was a sound chance that his claim may be held legally valid. *Herr*, 274 F.3d at 118–19. Plaintiff primarily relies

on two aspects of the record in this regard. First, plaintiff has provided an "expert report" written by a labor lawyer opining that defendant's arbitration challenges were taken in bad faith. However, the author of the report was not privy to any information unavailable at this stage of summary judgment and is of little value to my determination.

Second, plaintiff points to a section of former Solicitor to the School District Donald Spry's deposition testimony. In that testimony, Spry states that he informed the School Board when it was considering bringing a challenge to the award "that you're climbing uphill anytime you try to vacate an arbitrator's award." (Springer Aff. Ex. E at 38.) This unobjectionable characterization of the law regarding arbitration challenges could not be the sole basis from which a reasonable jury could infer that the School Board in fact did not believe that it had a "sound chance" at prevailing. Many forms of litigation can generally be said to be "uphill battles," but this does not mean that all such litigation is brought without probable cause, or even that a reasonable jury could so infer.

Because defendant's arbitration challenges were objectively reasonable, and because plaintiff has not presented a genuine issue of material fact as to defendant's subjective expectation of success, defendant's litigation is protected under the *Noerr–Pennington* doctrine and cannot form a basis for plaintiff's section 1983 claim. Thus, under either definition of sham litigation, the first prong has not been met. This being so, it is unnecessary to inquire into the second prong, defen-

---

**6.** In fact, the Pennsylvania Supreme Court considered similar challenges to arbitration awards in a pair of cases decided as late as this year. *See Greene County v. District 2, United Mine Workers of America*, 852 A.2d 299 (Pa.2004); *Office of the Attorney General v. Council 13, American Federation of State, County Municipal Employees, AFL–CIO*, 577 Pa. 257, 844 A.2d 1217 (2004).

dant's subjective motivation for challenging the award.

### 4. Delay in Paying Salary and Fringe Benefits Following Unsuccessful Appeal

■ Plaintiff argues that the School District delayed paying him back pay owed to him under the arbitration award and delayed updating his pay information with the Public Employee Retirement System as a means of retaliating against him for his exercise of First Amendment rights several years earlier. Plaintiff appears to concede that defendant was not obliged to pay plaintiff his back pay or benefits while defendant's initial challenge to the arbitration award was pending in state court.[7] Rather, according to the plaintiff, only "[i]n 2002 and 2003, [is it] reasonable to infer that defendant intentionally delayed making such payments." (Pl.'s Sur. Def.'s Mot. Summ. J. at 28.) The Court of Common Pleas denied defendant's Petition to Vacate the Arbitration Award on June 22, 2001. Schneck received payment of the money owed to him under the arbitration award on June 13, 2002. At that time of the Court of Common Pleas Order, however, it appears to be undisputed that Schneck owed the School District money for his failure to return to work following his sabbatical. Soon after the court's decision, Schneck's union lawyer Herring and the School District's attorneys began negotiating a settlement of the two outstanding and offsetting claims. (Def.'s Mot. Summ. J. Ex. 69.) These communications culminated in a settlement agreement that Schneck signed on May 13, 2002 and updated on May 22, 2002. (*Id.*, Def.'s Mot. Summ. J. Ex. 71.) The School Board approved the Agreement on June 10, 2002 and Schneck received payment three days

later. Such a minor delay cannot be considered an act that would deter a person of ordinary firmness from exercising his First Amendment rights.

With respect to the School District being slow to update his pay information in the Public Employee Retirement System ("PERS"), there is likewise no evidence that this was a retaliatory act sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. Plaintiff offers nothing more than the simple fact that his pension benefit credits were not fully updated until April 3, 2003, roughly 10 months after the settlement. Defendant's uncontroverted evidence shows that there was a bureaucratic mix-up in submitting the appropriate form to the PERS which caused the delay. (Def.'s Mot. Summ. J. at 103, Ex. 103, 104, 105.) Plaintiff's conclusory allegations that the School District "dragged its heels" in order "to retaliate against me for exercising my First Amendment rights" are not sufficient to survive summary judgment on this question. (Schneck Aff. at ¶ 42.) A ten-month delay in updating retirement records, in any event, cannot be said to be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.

### 5. Constructive Discharge

■ Plaintiff alleges that his "constructive discharge" on February 15, 2001 was a retaliatory act. Defendant objects to the application of the constructive discharge doctrine in a First Amendment retaliation case. In principle, I see no reason why constructive discharge should not be an independent actionable form of retaliation in this context, *see Sokol v. Reading Reg'l Airport Auth.,* No. CIV.A.99–111, 1999

---

7. Defendant relies on Pa. R.App. P. 1736, providing for automatic supersedeas during pending appeals and plaintiff has not disputed its applicability to petitions to vacate arbitration awards filed in the Court of Common Pleas.

WL 562757, at \*2 (E.D.Pa. July 23, 1999); but, because I find that plaintiff has not presented evidence from which a reasonable jury could conclude that plaintiff was constructively discharged, I do not need to resolve the question. The Third Circuit "employ[s] an objective test to determine whether an employee can recover on a claim of constructive discharge. Specifically, a court must determine whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir.2001) (citations omitted). Employee resignations are presumptively voluntary. *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir.1999). The plaintiff must present evidence that the employment situation reached a "threshold of intolerable conditions." *Duffy*, 265 F.3d at 169. Allegations of "stressful and frustrating" conduct are not sufficient to survive summary judgment. *Id.*

██ Plaintiff has not presented evidence of "intolerable conditions" such that "a reasonable person would have felt compelled to resign." *Id.* Plaintiff had not attended a day of work in nearly three years when he submitted his resignation. Over the prior seventeen months he had been on sick leave and sabbatical leave at his own request. While it may be theoretically possible for one to claim constructive discharge based on acts occurring almost entirely outside of the workplace, plaintiff has not alleged sufficient acts here. The apparent precipitating act to his constructive discharge was a cordial letter from Superintendent Tarola noting that Schneck was due back from sabbatical soon and asking Schneck to contact him "so that we might get together with Principal Harry Krammes to discuss your assignment and provide a general orientation for your return to the school setting."

(Def.'s Mot. Summ. J. Ex. 90.) It is true that at the time of Schneck's resignation, a long acrimonious history had passed between Schneck and his employer. However, many of the relevant events were well in the past, including his alleged protected speech and suspension. Moreover, outside of the decision to transfer plaintiff to the Middle School, which Tarola communicated to plaintiff well over a year prior to his resignation, plaintiff has presented no evidence suggesting that his everyday working conditions going forward would be affected at all by defendant's alleged retaliation. Thus, because no reasonable jury could find that the School District permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign, I find that plaintiff was not constructively discharged.

### 6. Whole Course of Conduct During the Statutory Period

██ I have decided *supra* that defendant's denial of plaintiff's sabbatical request occurred prior to the statutory period, that defendant's challenges to the arbitration award may not form a basis for section 1983 liability under the *Noerr–Pennington* doctrine, and that plaintiff was not constructively discharged as a matter of law. However, I ruled that the alleged delays in formally approving plaintiff's sabbatical following the May 19, 2000 settlement, in paying plaintiff's salary and fringe benefits following the challenges to the arbitration award, and in updating his payroll information with the PERS, each *standing alone* did not rise to the level of an adverse action. Plaintiff contends that each delay was "part of an overall scenario of open hostility and antagonism towards him." (Pl.'s Mem. Opp. Summ. J. at 4.) I therefore must consider whether these delays, taken as a whole, could be sufficient to deter a per-

son of ordinary firmness from exercising his First Amendment rights. "[A] plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." *Brennan*, 350 F.3d at 419 n. 16. *See also Zugarek v. Southern Tioga Sch. Dist.*, 214 F.Supp.2d 468, 476 (M.D.Pa. 2002) ("a plaintiff may state a cause of action for retaliatory harassment under 42 U.S.C. § 1983 if the court determines that the alleged acts of harassment, when viewed in their totality, are likely to deter a person of ordinary firmness from the exercise of his or her First Amendment rights") (quoting *Kadetsky v. Egg Harbor Township Bd. of Educ.*, 82 F.Supp.2d 327, 337 (D.N.J.2000) and *Rodriguez v. Torres*, 60 F.Supp.2d 334, 348 (D.N.J.1999)). Even looked at collectively, these minor delays, for all of which defendant has provided uncontroverted innocent explanations and for none of which plaintiff has provided evidence of retaliatory motive, cannot be said to constitute a course of conduct sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. No reasonable jury could so find.

## B. Application of Continuing Violations Doctrine

██ Plaintiff contends, however, that because defendant engaged in a pattern of antagonistic conduct, the "continuing violations" doctrine applies and plaintiff may therefore recover for the entire course of defendant's conduct, including acts preceding the statutory period. "The continuing violations doctrine is an 'equitable exception to the timely filing requirement.'" *Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir.2001) (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir.1995)). The doctrine is most frequently applied in the Title VII context, but has been applied in other contexts as well, including claims brought under section 1983. *See Cowell*, 263 F.3d at 292. To proceed under the doctrine, a plaintiff must establish both: 1) that "the last act evidencing the continuing practice falls within the limitations period"; and 2) that "the defendant's conduct is more than the occurrence of isolated or sporadic acts." *Id.* "The focus of the continuing violations doctrine is on affirmative acts of the defendants." *Id.* at 293.

Plaintiff's first hurdle, therefore, is to identify a retaliatory act that falls within the statutory period and evidences a pattern of retaliatory conduct. As discussed *supra*, of the acts plaintiff alleged to have occurred within the statutory period, only the defendant's delays in paying Schneck, formally approving his sabbatical, and updating his retirement records might plausibly vie for consideration as such an act. While I am dubious that any of these acts could reasonably be said to evidence a pattern of retaliatory conduct, I will assume, *arguendo*, that one of these acts meets this first requirement of the continuing violations doctrine.

██ Even assuming that one of the acts meets the first requirement, application of the continuing violations doctrine is inappropriate in this case because plaintiff has not demonstrated that the defendant's conduct is "more than the occurrence of isolated or sporadic acts of intentional discrimination." *West*, 45 F.3d at 755. Regarding this inquiry, the Third Circuit has instructed courts to consider at least three factors. Of primary importance is the "degree of permanence," *Cowell*, 263 F.3d at 292, *i.e.*, "whether the nature of the violations should trigger the employee's awareness of the need to assert [his or] her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate."

*West,* 45 F.3d at 755 n. 9. Courts should also consider "subject matter-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation" and "frequency-whether the acts are recurring or more in the nature of isolated incidents." *Cowell,* 263 F.3d at 292. I find consideration of the "degree of permanence" of defendant's alleged conduct to weigh so heavily against applying the continuing violations doctrine in this case, that it is virtually dispositive of the question-even assuming that other factors weigh in plaintiff's favor.[8]

I first consider whether the defendant's acts prior to the statutory period had a degree of permanence such that they should have triggered plaintiff's awareness

of the need to assert his rights. The School District suspended plaintiff from his job for more than a full school year, barred him from school property, rejected a settlement agreement regarding the length of his suspension, transferred him to a new position in the Middle School, made negative statements about him in the media, made a derogatory comment about him at a School Board meeting, and refused to grant him a sabbatical, all before the start of the statutory period.

The nature of these prior alleged violations unquestionably should have triggered plaintiff's awareness of the need to assert his rights. Plaintiff appears to have been passionately aware that he had been wronged upon the occurrence of most, if

---

8. Both parties direct me to the United States Supreme Court decision in *National Railroad Passenger v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). *Morgan,* however, addresses a different scenario. Justice Thomas, writing for the Court in the context of a Title VII claim, reasoned that the text of Title VII's charge filing provision bars recovery for "discrete acts of discrimination or retaliation that occur outside the statutory time period," but that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory period." *Morgan,* 536 U.S. at 105, 109–117, 122 S.Ct. 2061. The Court grounded its reasoning in the text of Title VII and found the "critical sentence of the charge filing provision" to be: "A charge under this section *shall be filed* within one hundred and eighty days *after the alleged unlawful employment practice occurred." Id.* at 109, 122 S.Ct. 2061 (citing 42 U.S.C. § 2000e–5(e)(1)). The Court went on to reason that the term "practice" did not convert "related discrete acts into a single unlawful practice for the purposes of timely filing," *id.* at 111, 122 S.Ct. 2061, but that "hostile environment claims are different in kind from discrete acts." *Id.* at 115, 122 S.Ct. 2061. "Their very nature involves repeated conduct." *Id.* "The 'unlawful employment practice' therefore cannot be said to

occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.... Such claims are based on the cumulative effect of individual acts." *Id.*

Section 1983 does not contain a charge filing provision akin to Title VII's. Rather, actions brought under section 1983 in Pennsylvania, as stated earlier, are governed by Pennsylvania's statute of limitations for personal injury actions. Pennsylvania's statute reads: "The following actions and proceedings must be commenced within two years: ... An action to recover damages for injuries to the person ... caused by the wrongful act ... of another." 42 Pa. Cons.Stat. Ann. § 5524. It is not at all clear that Justice Thomas' textual analysis of Title VII's charge filing provision applies by analogy to the text of this statute. Even if analogous, it is not inconsistent with the equitable doctrine of continuing violations, as articulated by the Third Circuit, which is at issue here. *See Cowell,* 263 F.3d 286 ("The continuing violations doctrine is an equitable exception to the timely filing requirement."). The *Morgan* Court's dichotomy between "discrete acts" and hostile environments is entirely consistent with the Third Circuit's emphasis on permanence, frequency and subject matter when applying the continuing violations doctrine in the section 1983 context. *Id.* at 292.

not all, of these alleged acts of retaliation. *See Cowell,* 263 F.3d at 295 ("[P]laintiffs were aware of the wrongfulness of the liens when the liens were imposed in 1992 and 1993. Therefore, the plaintiffs should have brought a claim to strike the liens in state court or filed a § 1983 claim within the applicable limitations periods."). The suspension alone clearly had a degree of permanence such that plaintiff's awareness of the need to assert his rights should have been triggered. From that point forward, it cannot be said that plaintiff was oblivious to the need to assert his rights.[9]

Importantly, it is undisputed that plaintiff *has* been asserting his rights with the assistance of legal counsel from the very beginning. Plaintiff noticed his intent to grieve his suspension on the day it was handed down. He also sought a writ of *mandamus* in state court to order the District to grant his sabbatical. Moreover, plaintiff publicly stated from the beginning of the endeavor that he believed defendant's conduct to be motivated by a desire to punish him for his inquiries into the "penny practice" at the High School. Thus, plaintiff was aware from the beginning not only of the alleged harm itself, but also defendant's prohibited motive. He simply failed to bring a claim for violation of the First Amendment. Allowing plaintiff to postpone raising these claims until the statute of limitations had run would violate the fundamental policy rationale behind the statute of limitations. *See Cowell,* 263 F.3d at 295 ("[T]he continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims. . . . Limitations pe-

riods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights."). Thus, once plaintiff failed to institute suit within the available time framework when he was required to do so, he lost his ability to resurrect these claims by later characterizing them as part of a continuing violation.

## V. Conclusion

Plaintiff has not presented evidence of actionable conduct within the statutory period, nor does the continuing violations doctrine apply to save plaintiff's claims based on acts occurring prior to the period. There being no other equitable ground for tolling the statute of limitations, I grant defendant's motion to dismiss plaintiff's section 1983 claim.[10] I decline to exercise supplemental jurisdiction over plaintiff's state law claims.

**AND NOW,** this \_\_\_ day of October 2004, upon consideration of defendant Saucon Valley School District's motion for summary judgment (Docket # 24) and plaintiff's response, it is hereby **ORDERED** that the said motion is **GRANTED.**

---

**9.** This is not to say, of course, that plaintiff would not have been able to bring claims for later retaliatory actions. However, once plaintiff's awareness of the need to assert his rights was so clearly triggered, he may not invoke the continuing violations doctrine with

respect to related retaliatory acts preceding the statutory period.

**10.** Because the statute of limitations is a dispositive ground for dismissing plaintiff's claim, I need not consider defendant's res judicata and merits arguments.